Alan Eugene **REED**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 9107.

United States Court of Appeals
Tenth Circuit.

May 23, 1967.

Martin C. Crawn, Kansas City, Kan., for appellant.

Newell A. George, Kansas City, Kan. (Benjamin E. Franklin, Kansas City, Kan., with him on brief), for appellee.

Before MURRAH, Chief Judge, and PICKETT and HICKEY, Circuit Judges.

MURRAH, Chief Judge.

Appellant, Alan Eugene Reed, and his co-defendant, Ivan Daniel Neighbors, who has not appealed, were convicted by a jury on an information charging them with wilful and malicious murder upon United States lands in violation of 18 U.S.C. §§ 1111–1112. Appellant's motion for new trial was denied, and he was sentenced to sixty years imprisonment.

On this appeal Reed has asserted three grounds of error: (1) insufficiency of the evidence to support a conviction; (2) admittance into evidence of a knife purported to be the murder weapon; and (3) failure to show a motive for committing the crime.

The Government's case is concededly based upon circumstantial evidence—there was no eye witness to the murder. But, even so, the Government's case may very well be based upon circumstantial evidence. We view such evidence only to determine whether, believing the Government's proof and disbelieving the defendant's countervailing proof, the jury was justified in finding

beyond a reasonable doubt that the defendant was guilty of the offense charged. See Jordan v. United States, 10 Cir., 370 F.2d 126; Williams v. United States, 10 Cir., 368 F.2d 972, 975; Real v. United States, 10 Cir., 326 F.2d 441, and cases cited.

The evidence tending to support the Government's case reflects that Reed and Neighbors, both inmates at the Federal Penitentiary in Leavenworth, Kansas, had been friends for many years and were "fall partners", i.e. they had been convicted of the same crime and were serving identical sentences; that since their confinement at Leavenworth, they had been constant companions even though Neighbors lived in cellhouse B while Reed lived in cellhouse C. On October 29, 1965, Grady Armstrong, a prisoner in B cellhouse, died of cut and stab wounds inflicted upon him in his cell. Sixteen witnesses testified to the circumstances relating to the crime, but we need narrate only that testimony which seems critical to the Government's case.

An inmate of cellhouse B testified for the Government to the effect that on or about October 26, 1965, Armstrong was lying in his cell on the fourth gallery [1] when there was "some loud noise" on the first floor; that he came out of his cell, leaned out and yelled down to Neighbors on the first floor "something about keep quiet, and they had a little exchange of words" in which "Somebody referred to somebody as a punk; I don't remember which one." He also testified that two or three days later on October 29 at about 5:00 p.m. he was going up the stairway from the third gallery to the fourth when he heard a scream; that when he reached the fourth gallery, he stepped back into the "cutoff", i.e. the opening between the two ends of the cell block", and saw two men

running, one of whom was Neighbors and the other he could not identify; that the men ran down the steps and out the side doorway toward the yard; and that an officer pursued them down the stairs to the door where he stopped before running out into the yard.

Officer Stauffer testified as the Government's chief witness to the effect that on the day of the murder he was patrolling the third, fourth and fifth galleries in cellhouse B during the evening mealtime [2]; that at approximately 5:00 p.m. he had made his round of the fourth gallery and had noticed Armstrong lying in his cell "supposedly asleep" with a towel over his forehead; that he continued his patrol on the fifth gallery, came back down the stairs and was at the corner of the fourth gallery when he heard a man scream; that as he turned the corner he saw two inmates, whom he later identified as Reed and Neighbors, emerging from a cell with a third immediately behind them "clutching his chest with blood coming out from the wounds he had received prior * * * to me coming to the fourth gallery"; that the other two inmates looked his way, hesitated for a moment and "left"; that he pursued them (past the deceased who had fallen to the floor) down the stairs, through the center part of the cellhouse and saw them run through the door to the yard; that he could see one of the inmates still running, and as he approached the open door "I saw an inmate waiting there for me with a knife"; that "I looked at his face and realized the situation and I looked at the knife and it still had blood on it. I immediately backed up and this man then started to run down a walkway"; that when he disappeared from sight he was running in the direction of the auditorium of the Protestant Chapel. Another officer testified that about the

---

1. Cellhouse B is composed of five galleries or floors consisting of individual or double cells running the length of the cellhouse. The stairway is in the center of the building with a cutout or walkway from either side of the stairs to each gallery.

2. During mealtimes, the North door from the cellhouse to the yard is open. The inmates are allowed to go down by galleries to eat their meals, to stay in the yard for awhile and to come back through the North door.

same time he also saw "someone running" in the direction of the auditorium. (On trial Stauffer identified the inmate with the knife as appellant Reed.) Stauffer testified further that by this time the other inmate had slowed to a walk; that he hailed another officer and they pursued the man and took him into custody. (On trial he identified this inmate as Neighbors.) He testified that Neighbors was left in the custody of the other officer while he returned to the cellhouse, placed Armstrong on a stretcher and turned him over to some other officers who took him to the hospital. About an hour and a half later, Reed was taken into custody and Stauffer identified him as one of the men he had pursued.

A patient on the second floor of the prison hospital, directly across from the auditorium, testified that he was "sitting by the window on the bed, looking out the window, I heard a scream coming from the direction of B cellhouse. * * * I saw a man run over here [indicating on a scale model of the prison] where there are some bushes, D cellhouse, stop and cast a glittering object upon the auditorium of the Protestant chapel and the man stepped around the corner and went into D cellhouse." Another prison officer testified that on the day after the murder he "picked up a knife on the roof of the auditorium building", wrapped it in a handkerchief and "turned it in to the captain's office"; that two days later he returned to the captain's office, identified the weapon he had found, put his initials on it with an electric needle for identification purposes and placed it in a large brown envelope. When shown the knife as a Government exhibit, he testified that it was the same knife he had found and that it was in substantially the same condition as when he found it. When Stauffer was shown the knife as a Government exhibit, he stated that "This knife resembles very closely the knife that was pulled on me at the north door [to cellhouse B]." Another Government witness (an F.B.I. agent) testified that

the knife exhibit had been subjected to laboratory tests and was found to have human blood on it.

■  The crux of appellant's argument is that the evidence is critically inconsistent and insufficient and, therefore, does not justify a verdict of guilty. He points out that only one of the Government's sixteen witnesses could identify Reed and relies upon the countervailing evidence tending to show an alibi. He also suggests the total lack of evidence of motive, but at the same time concedes that it is not essential to the Government's case. And see Pointer v. United States, 151 U.S. 396, 414, 14 S.Ct. 410, 38 L.Ed. 208. We think the circumstantial evidence entirely sufficient to justify the verdict of the jury.

■■  Reed attacks the ruling of the court admitting the knife into evidence contending that no proper foundation was laid. The law applicable to admissibility of physical exhibits is clearly stated in Brewer v. United States, 8 Cir., 353 F.2d 260, to the effect that if, upon consideration of the nature of the article, the circumstances surrounding the preservation and custody of it and the likelihood of intermeddlers tampering with it, the trial judge deems the article to be in substantially the same condition as when the crime was committed, he may admit it into evidence, and his determination "that the showing as to identification and nature * * * is sufficient to warrant reception of an article in evidence may not be overturned except for a clear abuse of discretion." Id., 262, quoting and citing Gallego v. United States, 9 Cir., 276 F.2d 914, 917; see also West v. United States, 8 Cir., 359 F.2d 50, 55. We find no such abuse here.

There was testimony by the officer who found the knife, by the prison custodian and by the F.B.I. agent who had run laboratory tests on the knife tending to establish its proper care and preservation in the interim between its discovery and the trial. These witnesses further testified that when it was of-

fered in evidence it was in the same condition as when it was found and examined.

With typical care and solicitude Judge Stanley heard argument out of the presence of the jury on the objections to the knife's admissibility. In ruling on the evidence he noted there were some minor inconsistencies in the testimony, but then stated that " * * * all of this, I think, goes to the weight of the evidence rather than to its admissibility." We think the knife was properly received in evidence.

The judgment is affirmed.