**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas Norman GAY,
Defendant-Appellant.**

**No. 83–2449.**

United States Court of Appeals,
Tenth Circuit.

Sept. 26, 1985.
Rehearing Denied Oct. 18, 1985.

David J. Mintz, Denver, Colo. (Emerson B. Semple, Denver, Colo., was also on brief) for defendant-appellant.

William D. Welch, Asst. U.S. Atty., Denver, Colo. (Robert N. Miller, U.S. Atty., Denver, Colo., was also on brief) for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, and BREITENSTEIN and SEYMOUR, Circuit Judges.

HOLLOWAY, Chief Judge.

In a bench trial after a jury was waived, defendant Gay was convicted on one count of possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982). On this direct appeal from his conviction, Gay challenges the sufficiency of the evidence, the sufficiency of the chain of custody established by the Government, several searches and seizures which produced most of the Government's evidence, and the admissibility of certain statements made prior to his being advised of the *Miranda* rights.

## I

### The Factual Background

The Government's evidence tended to show the following facts:

On the morning of August 12, 1983, Colorado State Troopers Crandall and Witt were notified at their Idaho Springs office by telephone to watch for a late model blue Chrysler with out-of-state tags traveling west toward their location. The driver was suspected of driving under the influence. Trooper Crandall went outside the office to a position where he could observe the exit from Interstate 70. Subsequently, Trooper Crandall observed a blue Chrysler, heading west, being driven erratically by the defendant.

Gay drove past Trooper Crandall some 150 yards. He stopped briefly in the traffic lane and continued on until he parked in a lot off Colorado Boulevard. Both Troopers Crandall and Witt observed Gay exit his automobile and saw him stagger and sway as he walked. The troopers both testified that Gay's words were understandable but slurred and his eyes bloodshot, clothes wrinkled, and hair unkept. (Tr. III, 23, 23, and 41–42).

The troopers asked Gay for his driver's license. When the license had been produced, Trooper Witt asked Gay to empty his "bulgy" pockets. (Tr. III, 42). Gay emptied his pockets and placed the contents on the trunk of the Chrysler. With Gay's permission, Trooper Witt looked inside the automobile for the purpose of checking the registration in the glove box. While looking inside the automobile Trooper Witt observed a piece of cardboard and a vial containing a white liquid. Trooper Witt returned to the rear of the vehicle and looked through the contents of Gay's pockets. Trooper Witt picked up a small tin container, at which time Gay stated, "That's cocaine, too!" (Tr. III, 45). When Trooper Witt asked permission to look inside the trunk, Gay responded, "No. If [you] look in there, then I'd really be in trouble." (Tr. III, 45).

Gay was then arrested and advised of his rights. After sealing the automobile with tape, the troopers obtained a warrant to search the automobile. In their search, the troopers found a canvas gym bag containing two ziplock bags and a box of baking soda. The two bags each contained 1.2 pounds of 73% to 74% pure cocaine, with a total street value of between $55,000 to $65,000.

Gay offered no testimony. He did introduce an exhibit (Defendant's Exhibit C) which, was a 1982 article from the *Journal of Psychoactive Drugs* [1] on cocaine smoking. In substance, the article stated that smoking of cocaine free base (as opposed to intranasal ingestion of cocaine) was increasing in popularity among all classes of drug users. It further stated that a cocaine free base user can typically consume from one to thirty grams of cocaine per day, from 30 to 900 grams per month. Therefore, the personal needs of the cocaine free base user are significantly greater than those of the traditional intranasal user.

After the bench trial the judge heard arguments by counsel. He denied a motion for a judgment of acquittal by the defendant and then found that the following matters had been proved beyond a reasonable doubt.

The court found that on August 12, 1983, the defendant was in possession of about 2.4 pounds of cocaine in the state and district of Colorado. Cocaine was found to be a controlled substance listed in Schedule 2 of 21 U.S.C. § 812. The court further found that defendant knowingly and intentionally possessed the cocaine at that time.

The court further found from the amount being large, from the fact it was being transported, and from circumstances generally, that there was an intent to distribute this cocaine. It appeared to the court that even if one would speculate that the defendant were free basing, as counsel invited the court to speculate or find based on very little if any real evidence, then there was nothing inconsistent with his free basing and also distributing; at least there was no evidence of any such inconsistency. It was found highly unlikely because of the extremely large amount of

1. Siegel, *Cocaine Smoking,* 14 J. Psychoactive Drugs 288–89, 315–16 (1982).

value of the cocaine—$50,000.00 to $60,-000.00 in value if uncut—that there was any purpose other than distribution involved. The expert opinion, undisputed and uncontradicted, was found to show that the amount was too large for any reasonable inference of personal use. The court found that the expert, Mr. Barnhill, was very credible and well qualified to state his opinion through many years of experience in law enforcement. The court found and concluded the defendant was guilty of having violated 21 U.S.C. § 841(a)(1) as charged.

The court's written order of conviction followed, adjudging that the defendant was guilty of knowingly and intentionally possessing with intent to distribute approximately 2.4 pounds of cocaine in violation of 21 U.S.C. § 841(a)(1) as charged in Count I of the indictment. This appeal followed.

## II

### The Sufficiency of the Evidence

Gay contends on appeal that the evidence presented at trial was insufficient to support his conviction for possession of cocaine with the intent to distribute. Specifically, Gay argues that mere possession of such an amount of cocaine is insufficient for a conviction under § 841(a)(1), absent any direct or circumstantial evidence to support an inference of intent to distribute.

The standard of evidentiary review in criminal cases is well settled. "The evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, the fact finder may find the defendant guilty beyond a reasonable doubt." *United States v. Yates*, 470 F.2d 968, 970 (10th Cir.1972) (quoting *United States v. Ortiz*, 445 F.2d 1100, 1103 (10th Cir.1971), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971) ); *see also United States v. Petersen*, 611 F.2d 1313,

1317 (10th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980); *United States v. Hubbard*, 603 F.2d 137, 142 (10th Cir.1979). To be sufficient, the evidence must do more than raise a mere suspicion of guilt. *United States v. Ortiz*, 445 F.2d at 1103.

■ It was incumbent on the Government to prove that the defendant knowingly possessed the controlled substance with the intent to distribute.[2] 21 U.S.C. § 841(a)(1) (1982); *see United States v. Compton*, 704 F.2d 739, 742 (5th Cir.1983). The "intent to distribute" element is generally established through circumstantial evidence. *See United States v. DuFriend*, 691 F.2d 948, 951–52 (10th Cir.1982), *cert. denied*, 459 U.S. 1173, 103 S.Ct. 820, 74 L.Ed.2d 1017 (1983). The quantity of the drug possessed is a circumstance which may permit the inference that the possessor intended to sell, deliver, or otherwise distribute. *United States v. Espinosa*, 771 F.2d 1382, 1397 n. 17 (10th Cir.1985) (approximately 20,000 pounds of marijuana); *United States v. DuFriend*, 691 F.2d at 951–52 (approximately 600 pounds of marijuana); *see also United States v. Kelly*, 749 F.2d 1541, 1546 (11th Cir.1985) (approximately 28,000 pounds of marijuana); *United States v. Dreyfus-de Campos*, 698 F.2d 227 (5th Cir.1983), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983) (approximately fourteen ounces of cocaine); *United States v. Flynn*, 664 F.2d 1296 (5th Cir.1982), *cert. denied*, 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982) (thirteen tons of marijuana); *United States v. Grayson*, 625 F.2d 66 (5th Cir.1980) (304.77 grams of cocaine). The underlying theme of such cases is that the defendant possessed a quantity which was more than he would possess for his own use. *See, e.g., United States v. Ortiz*, 445 F.2d at 1105.

■ It is clear that Gay possessed no small amount of cocaine.[3] However, here the evidence did not end with the quantity

---

**2.** Gay does not challenge the trial court's finding that he was in possession of the cocaine.

**3.** The use of large amounts even up to two grams of opium per day or the use of drugs for medicinal purposes may be disregarded by the trier of fact in finding that the quantity of the

of the cocaine alone. Expert testimony at trial fixed the resale value of the cocaine at approximately $55,000 to $65,000.[4] The purity of the cocaine seized was well above the purity of the drug found on the street.[5] The seized cocaine was 73% to 74% pure. At about the time of the seizure, cocaine was being sold in Denver with from 30% to 50% purity. (Tr. IV, 90). The troopers also found a box of baking soda, a known dilutant, in the gym bag with the cocaine. (Tr. IV, 80).

 It is true that the evidence supporting the conviction of possession with the intent to distribute is circumstantial.[6] *United States v. Henry,* 468 F.2d 892, 894 (10th Cir.1972); *United States v. Ebey,* 424 F.2d 376 (10th Cir.1970). Nonetheless, the circumstantial evidence required to support a verdict need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities save guilt. *United States v. Henry,* 468 F.2d at 894. We are satisfied that there was sufficient evidence to sustain the finding of guilt.

### III

### Sufficiency of the Chain of Custody

Gay argues that the trial court should not have admitted the exhibits in evidence.[7]

Gay claims that the Government failed to establish a chain of custody sufficient to admit the exhibits and that there is no assurance that the exhibits have not been tampered with.

Troopers Witt and Crandall testified that they were the officers who originally seized the physical evidence. Trooper Witt further testified that the exhibits never left his sight until he handed them over to the agent. (Tr. IV, 37). At trial, Trooper Witt was able to identify the exhibits by evidence tags placed on the packets as well as by color, weight, and type of package or container. (Tr. IV, 34–35, 38–42).

After checking the identification of Colorado Bureau of Investigation Agent Olivarez, Trooper Witt handed the exhibits over to him.[8] Agent Olivarez testified that he took possession of the exhibits and kept them overnight in his bedroom. (Tr. IV, 53). He further testified that the next morning he placed the exhibits in an alarmed evidence locker until he hand delivered them to the chemist approximately two days after he first received the exhibits. (Tr. IV, 55). At trial, Agent Olivarez identified the exhibits by the appearance of their size and peculiarities as well as by his

drug was sufficient to infer the intent to distribute. *See United States v. Koua Thao,* 712 F.2d 369, 371 (8th Cir.1983).

4. Intent to distribute may be inferred from the resale value of the controlled substance. *See United States v. Espinosa,* 771 F.2d at 1397 n. 17; *United States v. Burns,* 624 F.2d 95, 102 (10th Cir.1980), *cert. denied,* 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980).

5. An inference may be drawn that the "purer" the drug, the more likely it will be "cut" for resale. *See United States v. Burns,* 624 F.2d at 102; *United States v. Ehlebracht,* 693 F.2d 333, 339 (5th Cir.1982); *United States v. Herron,* 567 F.2d 510, 513 (D.C.Cir.1977).

6. There are, nevertheless, some dangers associated with the use of circumstantial evidence that are not associated with the use of direct evidence. "Circumstantial evidence is a very tricky thing ...; it may seem to point very straight to one thing, but if you shift your own point of view a little, you may find it pointing in an equally uncompromising manner to something

entirely different." A. Doyle, *The Boscombe Valley Mystery,* The Adventures of Sherlock Holmes. However, it would substantially hamstring the police if the only basis on which they could arrest a suspect for possession with intent to distribute was to wait until the suspect actually distributed the controlled substance.

7. The exhibits are as follows: Exhibit 2 and 8—two packets of cocaine found pursuant to a warrant search of the trunk; Exhibit 3—tin container and the cocaine found therein; Exhibit 4—glass vial containing a white liquid; and Exhibit 5—box of baking soda. Though unclear, it does appear that defendant's counsel stipulated to the authenticity of the glass vial (Exhibit 4) (Tr. IV, 41); however, we treat the exhibit as if there were no such stipulation.

8. None of the packets (Exhibits 2 and 8) were sealed when handed over to Agent Olivarez; however, the type of plastic bags in question were similar to "ziplock" bags with their own built-in seal. (Tr. IV, 45–47). The tin container (Exhibit 3) was sealed with evidence tape. (Tr. IV, 39–40).

signature on the evidence tags. (Tr. IV, 65–66).

Chemist Battles testified that upon the receipt of the exhibits from Olivarez, she placed her initials, the case number, and the date on each exhibit. (Tr. IV, 76–77). After conducting the experiments on the powders, she sealed the exhibits in a bag and was present when the sealed bag was transported to and opened in the courtroom. (Tr. IV, 77–80).

■■■ A chain of custody indirectly establishes the identity and integrity of the evidence by tracing its continuous whereabouts. *United States v. Zink*, 612 F.2d 511, 514 (10th Cir.1980). The criterion for admissibility is a showing that the physical evidence proffered is in substantially the same condition as when the crime was committed. *United States v. Wood*, 695 F.2d 459, 462 (10th Cir.1982); *Reed v. United States*, 377 F.2d 891, 893 (10th Cir.1967); *see also United States v. Brown*, 482 F.2d 1226, 1228 (8th Cir.1973). The factors to be considered by the trial judge in deciding whether the criterion has been met include the nature of the article, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers having tampered with it. *United States v. Wood*, 695 F.2d at 462; *see also United States v. Brown*, 482 F.2d at 1228. We will not overturn the trial court's determination that the showing as to identity and nature of the exhibit is sufficient to warrant the admissibility of evidence except for a clear

abuse of discretion. *United States v. Wood*, 695 F.2d at 462; *United States v. Gagnon*, 635 F.2d 766, 770 (10th Cir.1980), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981); *United States v. Zink*, 612 F.2d at 514; *United States v. Coleman*, 524 F.2d 593, 594 (10th Cir.1975) (per curiam); *O'Quinn v. United States*, 411 F.2d 78 (10th Cir.1969). Absent an abuse of discretion, deficiencies in the chain of custody go to the weight of the evidence and not its admissibility.[9] *See United States v. Wood*, 695 F.2d at 462.

■■■ The trial court admitted the exhibits on the basis of the testimony of Trooper Witt, Agent Olivarez, and Chemist Battles. Trooper Witt and Agent Olivarez were able to identify the exhibits by the evidence tags placed on the packets, as well as by the exhibits' appearances as to size and peculiarities. (Tr. IV, 34–35, 38–42, 65–66). *See, e.g., Rosemund v. United States*, 386 F.2d 412 (10th Cir.1967) (per curiam); *see also United States v. Barnes*, 586 F.2d 1052, 1056 (5th Cir.1978). Chemist Battles was able to identify the exhibits by her initials and other markings placed on the exhibits by her. (Tr. IV, 76–77). She was also present when the exhibits were sealed and later opened in the courtroom. (Tr. IV, 77–80). Thus, the Government had shown a chain of custody from the day of the seizure to the day of the trial.[10] Absent some showing by the defendant that the exhibits have been tampered with, it will not be presumed that the investigators who had custody of them would do so.[11] *Unit-*

9. *See, e.g., Reed v. United States*, 377 F.2d at 894, where this court affirmed the trial court's finding of admissibility of certain evidence even though there were minor inconsistencies in the testimony. We concluded that such inconsistencies go only to the weight accorded the evidence. *Id.*

10. Defendant's counsel was able to elicit testimony, by way of cross-examination, from Agent Olivarez showing no recordation of how and when the exhibits were returned to him by Chemist Battles. However, there was sufficient testimony by both Olivarez and Battles for the trial court to conclude that the chain of custody was sufficient. It is important to note that at all pertinent times the exhibits were in the possession of Trooper Witt, Agent Olivarez, or Chemist

Battle. *Accord Rosemund v. United States*, 386 F.2d at 412. Any 'contention that the substance was not cocaine attacks the credibility of the chemist and of the officers and thus affects the weight of the evidence. *See United States v. Wood*, 695 F.2d at 462 (citing *United States v. Kaiser*, 660 F.2d 724, 733–34 (9th Cir.1981), *cert. denied sub nom., House v. United States*, 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 (1982), *cert. denied sub nom., Remsing v. United States*, 457 U.S. 1121, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982) ).

11. *See, e.g., United States v. Gagnon*, 635 F.2d at 770 (marijuana stored in a pickup overnight in the garage of the sheriff was admitted although an intrusion by pranksters was possible).

*ed States v. Wood,* 695 F.2d at 462; *O'Quinn v. United States,* 411 F.2d at 80 (citing *Brewer v. United States,* 353 F.2d 260, 263 (8th Cir.1965)). There was no evidence introduced at trial showing any tampering with or alteration of the exhibits.

We cannot say that the trial court abused its discretion in admitting the exhibits in evidence.

## IV

### Motions to Suppress

When reviewing the denial of a motion to suppress, we must accept the trial court's findings of fact unless they are clearly erroneous. *See United States v. Leach,* 749 F.2d 592, 600 (10th Cir.1984); *United States v. Rios,* 611 F.2d 1335, 1344 (10th Cir.1979). Furthermore, we must consider "the evidence adduced at the suppression hearing and the trial in the light most favorable to the government." *United States v. Leach,* 749 F.2d at 600 (quoting *United States v. Rios,* 611 F.2d at 1344); *see also United States v. Obregon,* 748 F.2d 1371, 1376 (10th Cir.1984); *United States v. DiGiacomo,* 579 F.2d 1211, 1216 (10th Cir.1978).

### A.

### The Fourth Amendment

Gay contends that the trial court erred in admitting in evidence the fruits of allegedly unlawful searches. The court admitted the evidence, finding that some of the exhibits were discovered pursuant to a valid consent search, while others were discovered pursuant to a valid warrant search. (Tr. III, 73–74). We deal with each search separately.

### 1.

### The glovebox and the glass vial

Gay argues the glass vial (Exhibit 4) was seized in violation of his Fourth Amendment rights. Gay contends that his intoxication at the time renders any consent to search invalid, and, if consent were deemed valid, that the troopers exceeded the scope

of consent when they seized the glass vial. We find no merit in these arguments.

The record shows that Trooper Crandall received a telephone call from the Denver dispatcher of the Colorado State Patrol advising him of a report of a driver possibly operating an automobile under the influence, traveling westbound on Interstate 70. (Tr. III, 14). The Denver dispatcher described the automobile as a "light blue Chrysler product, four-door, with black and yellow tags on it." (Tr. III, 16). Shortly after the telephone call, Trooper Crandall observed an automobile fitting the description exiting Interstate 70 at Exit 241. (Tr. III, 15). While exiting, the automobile passed within six feet of Trooper Crandall who later testified that the automobile was traveling at an unusually slow exit speed (approximately ten miles per hour). (Tr. III, 17). Trooper Crandall watched the automobile travel approximately 150 yards past the Colorado State Patrol station. The vehicle stopped from ten to fifteen seconds in the traffic lane blocking traffic. It then completed the exit and again stopped in a parking lot off of Colorado Boulevard. (Tr. III, 18–19). At this point, troopers Crandall and Witt approached the stopped vehicle to investigate.

It is clear that the Fourth Amendment applies to seizures of the person, including brief investigatory (also known as "Terry") detentions. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981); *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968). It is also well settled that an officer need not have probable cause to arrest the suspect before he may detain and investigate; however, in order to justify an investigative stop, an officer, under an objective standard, "must be able to point to specific and articulable facts which, taken together with natural inferences from those facts, reasonably warrant that intrusion ..." *Terry v. Ohio,* 392 U.S. at 20–21,

88 S.Ct. at 1879–80; *see also United States v. Uribe,* No. 84–1146, slip op. at 8–9 (10th Cir. Jun. 17, 1985); *United States v. Gonzalez,* 763 F.2d 1127, 1130 (10th Cir. 1985); *United States v. Recalde,* 761 F.2d 1448, 1454 (10th Cir.1985).

■ Though the troopers here did not have probable cause to stop every "light blue Chrysler four-door with black and yellow tags" heading west on Interstate 70 and to formally arrest its occupants, there was an adequate basis for a *Terry* detention.[12] The observed conduct of the driver in exiting Interstate 70, coupled with the prior telephoned report, generated a reasonable and articulable suspicion. Furthermore, when the troopers approached the automobile, Gay had already exited the vehicle and appeared to be intoxicated. Gay was staggering and swaying as he walked; his speech though understandable was slurred; he appeared to the troopers to be in an unkept condition.[13] (Tr. III, 18–23, 40–42).

Gay first contends that the search of his glove box was conducted without his consent, thus violating his Fourth Amendment rights. He further argues that if consent were given, such consent was invalid due to his state of intoxication at the time.

■ A well-settled tenet of Fourth Amendment jurisprudence is that searches conducted without a warrant and probable cause are per se unreasonable, subject only to a few recognized exceptions. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). A search and seizure, of course, may be made without a warrant or probable cause if the suspect voluntarily con-

sents.[14] *Schneckloth v. Bustamonte,* 412 U.S. at 219, 222, 93 S.Ct. at 2043, 2045; *United States v. Diaz-Albertini,* 772 F.2d 654, 658 (10th Cir.1985); *United States v. DiGiacomo,* 579 F.2d at 1215. Whether a consent was voluntary or was the product of coercion or duress, express or implied, is to be determined by the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte,* 412 U.S. at 227, 248–49, 93 S.Ct. at 2047, 2058–59; *United States v. Recalde,* 761 F.2d at 1453. Such consent is a matter which the Government has the burden of proving. *United States v. Mendenhall,* 446 U.S. at 557, 100 S.Ct. at 1878; *Schneckloth v. Bustamonte,* 412 U.S. at 222, 93 S.Ct. at 2045; *United States v. Diaz-Albertini,* 772 F.2d at 658; *United States v. Recalde,* 761 F.2d at 1453. *See also United States v. Uribe,* slip op. at 12.

■ This court has explicated a three-tiered standard for determining whether the Government has sustained the burden of showing that consent was voluntary:

First, there must be clear and positive testimony that the consent was unequivocal and specific. Second, the Government must establish that the consent was given without duress or coercion. Finally, we evaluate those first two standards with the traditional indulgence of the courts against a presumption of waiver of constitutional rights.

*United States v. Recalde,* 761 F.2d at 1453. *See United States v. Abbott,* 546 F.2d 883, 885 (10th Cir.1977).

■ Gay's attack on the trial court's finding that his consent was voluntary focuses on his capacity to consent. He argues that his consent to search was ineffec-

---

**12.** *See, e.g., Luckett v. State,* 259 Ind. 174, 284 N.E.2d 738, 741–42 (1972).

**13.** Though not entirely clear from the record it appears the trial court concluded that based upon the telephone call and the personal observations, the troopers had not only reasonable suspicion to detain but also probable cause to arrest Gay. (Tr. III, 74).

**14.** It is settled that the Fourth Amendment itself requires only that a consent to search be voluntary in the sense of the traditional definition of voluntariness, and not coerced, by explicit or implicit means, by implied threat or covert force. *See Schneckloth v. Bustamonte,* 412 U.S. at 228–29, 93 S.Ct. at 2048–49; *see also United States v. Cage,* 494 F.2d 740, 742 (10th Cir.1974) (per curiam).

tive because his drug intoxication rendered him incapable of making a rational decision. The issue squarely put is whether Gay was so intoxicated that his consent to search was not the product of a rational intellect and a free will. *See, e.g., United States v. Leland,* 376 F.Supp. 1193, 1199 (D.Del.1974). The question is one of mental awareness so that the act of consent was that of one who knew what he was doing. It is elementary that one must know he is giving consent for the consent to be efficacious. *See, e.g., United States v. Elrod,* 441 F.2d 353, 356 (5th Cir.1971).

■ There is ample support in the record for the trial court's conclusion that Gay's consent to search the glove box was valid. It was conceded by the Government that Gay was in an intoxicated state; he staggered and swayed, he used the vehicle to support himself, and his speech was slurred. (Tr. III, 18–23, 40–42). Trooper Crandall conceded that Gay was not in the sort of condition one would want to be in for the making of "very important decisions regarding their life...." (Tr. III, 27). Nonetheless, there are different degrees of intoxication. One can be too intoxicated to operate a motor vehicle, but rational enough to understand requests and to give plausible explanations. *See, e.g., United States v. Leland,* 376 F.Supp. at 1199. The record shows that Gay was able to answer questions addressed to him by the troopers. He produced his driver's license upon request. (Tr. III, 41). Gay responded when asked if he had been drinking. (Tr. III, 33). He emptied his pockets upon the request of one of the troopers. (Tr. III, 42). Finally, it is important to note that Gay consented to a search of the glove box which did not contain any incriminating evidence (Tr. III, 43), while he denied access to the trunk which a search later revealed contained 2.4 pounds of cocaine. (Tr. III, 45). We cannot say the trial court was clearly in error in finding the consent was valid.

■ Second, Gay argues that even if the consent were valid, the troopers exceeded the scope of the consent when seizing the glass vial. The scope of a consent search is limited by the breadth of the actual consent itself. *See State v. Koucoules,* 343 A.2d 860, 866 (Me.1974). Consent to search a specific area limits the reasonableness of the search to that area. Any police activity that transcends the actual scope of the consent given encroaches on the Fourth Amendment rights of the suspect. *See, e.g., State v. Johnson,* 71 Wash.2d 239, 427 P.2d 705 (1967).

■ The record shows that although Gay consented to a search of the glove box, Trooper Witt discovered the vial in an open ashtray adjacent to the glove box. (Tr. III, 51). Thus there was undisputed evidence that the vial was in plain view when discovered and seized. The vial was found in an open ashtray and in close proximity to the glove box. That which is in plain view is not the product of a search. Objects within the plain view of an officer, who has a right to be in a position to have that view, are subject to seizure. *United States v. Marquez,* 687 F.2d 328, 331 (10th Cir.1982); *see also Bretti v. Wainwright,* 439 F.2d 1042, 1046 (5th Cir.1971), *cert. denied,* 404 U.S. 943, 92 S.Ct. 293, 30 L.Ed.2d 257 (1971).

**2.**

### Search of the contents of Gay's pockets

Defendant Gay also asserts error in the denial of his motion to suppress evidence obtained as a result of his being compelled to empty his pockets—the tin container and statements he made after the vial and the tin container were found. He argues that the officer required him to empty his pockets without a warrant and prior to duly performing the constitutionally required, less intrusive pat-down. Brief of Appellant 16. He says that examination of the contents of his pockets was clearly a search, whether the pockets were emptied by the trooper or by Gay himself under the compulsion of the circumstances, citing *United States v. DiGiacomo,* 579 F.2d 1211 (10th Cir.1978). Brief of Appellant 17. While the trial judge ruled that there was con-

scious knowledge and consent to look in the glove compartment "or in the can or tin" (Tr. III, 16), we instead uphold the trial judge on the ground that the search was incident to a lawful arrest.

■■■ *DiGiacomo* does hold that examination of the detainee's pocket contents is a search, whether the pocket is emptied by the officer or the detainee under the compulsion of the circumstances. *Id.* at 1215. Here, however we conclude that even viewed as a search, the search was incident to a lawful arrest. It is true that the formal arrest here occurred after the tin was produced from Gay's pocket. (Tr. III, 46). Furthermore, an incident search may not precede the arrest and serve as part of its justification. *Sibron v. New York*, 392 U.S. 40, 63, 67, 88 S.Ct. 1889, 1902, 1904, 20 L.Ed.2d 917 (1968). However, the fact that the search here occurred before the formal arrest did not invalidate the search, for here the arrest "followed quickly on the heels of the challenged search." *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980); *see United States v. Romero*, 692 F.2d 699, 704 (10th Cir.1982).

■■■ In sum, the record shows without dispute that defendant Gay had been stopped and had stated to the officers that he had not been drinking. As noted, his condition and his speech were such that they believed him under the influence of an intoxicant, and that left the probability of drugs. Gay had given no other reason why he would be acting as he was. (Tr. III, 33). In light of these circumstances and the vial that had been discovered in the ashtray, there were clear grounds for arrest. Further, Trooper Crandall said that at this time Gay was not free to leave, although he was not formally arrested until later. (Tr. III, 33). Thus, without consideration of the tin produced from Gay's pocket and

statements after it was observed, in effect Gay was already apprehended. Even if the removal of the items from Gay's pockets were not made with consent, these items were the product of a search that was incident to an arrest which "followed quickly on the heels of the challenged search." *Rawlings v. Kentucky*, 448 U.S. at 111, 100 S.Ct. at 2564.

We hold that the challenge to the statements and items produced from the pockets of defendant Gay is without merit.

### 3.

### Search of the trunk

The trunk and its contents were searched pursuant to a warrant.[15] Gay contends that the warrant was issued without probable cause.[16] He makes this contention assuming the validity of his motions to suppress his statements and the evidence seized, arguing further that the remaining allegations in the affidavit for the search warrant were insufficient to show probable cause for the search of the trunk. Brief of Appellant 18. Since we affirm the trial court's denial of the motions to suppress, Gay's contention as to the lack of probable cause sufficient for the issuance of a warrant is without merit. It is clear that the affidavit viewed as a whole provided a substantial basis for a finding of probable cause. *See Massachusetts v. Upton*, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721, 35 Crim.L.Rep. 4044 (1984) (per curiam).[17]

### B.

### The Fifth Amendment

Gay further contends that the trial court erred in failing to suppress two inculpatory statements made by him to the troopers before the latter informed him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

---

**15.** The search produced, *inter alia*, what were to become Exhibits 2, 5, and 8—the 2.4 pounds of cocaine and the box of baking soda.

**16.** Gay did not choose to attack the issuance of the warrant on any procedural ground.

**17.** There is no claim of error asserted on appeal that the search of the gym bag and the plastic bag found in it was unlawful.

■ The safeguards outlined in *Miranda* are required when a suspect is taken into custody and subjected to interrogation. Thus, as a general rule, the *Miranda* warnings presuppose the satisfaction of two conditions—custody and interrogation.[18] Each condition has generated its own body of precedent. There is little doubt that Gay was in the custody of the troopers when the statements were made.[19] The crucial issue, however, is whether the statements were made as a result of "interrogation."

■ "Interrogation" is best viewed as an umbrella term encompassing words or actions that the police should know are reasonably likely to elicit an incriminating response.[20] *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Turning to the first inculpatory statement made by Gay, we find that the trial court did not err in admitting it into evidence. The statement "[t]hat's cocaine, too"[21] was not a result of words or actions that the police *"should have known* were reasonably likely to elicit an incriminating response."[22] *Rhode Island v. Innis*, 446 U.S. at 302, 100 S.Ct. at

1690 (emphasis in original). The statement was volunteered by Gay. *See United States v. Fallon*, 457 F.2d 15, 19 (10th Cir.1972). It was spontaneous. *Id.* The mere fact that one of the troopers picked up the tin container is not, in itself, an act an officer should have known was likely to elicit an incriminating response.[23] Thus, as it is clearly stated in *Rhode Island v. Innis*, 446 U.S. 291, 301–02, 100 S.Ct. 1682, 1689–90, the police "cannot be held accountable for the unforeseeable results of their words or actions ..."

■ The trial court did not err in admitting the second inculpatory statement as well. In response to the trooper's request to search the trunk, Gay stated, "No. If [you] look in there, then I'll really be in trouble." (Tr. III, 45). We cannot agree that the request to search the trunk was accusatory. Such a request generally cannot be said to lead to an incriminating response.[24] Furthermore, the incriminating portion of the statement was unresponsive to the request. It would be unreasonable to hold the troopers accountable

**18.** The essence of *Miranda* is that when these two conditions coexist (custody & interrogation), the environment the suspect is kept in is inherently coercive. *Miranda* is thus intended as a safeguard in counteracting the coercive environment.

**19.** The record shows that although Gay was not formally placed under arrest when the statements were made, he was not free to leave the scene. (Tr. III, 56).

**20.** As such, interrogation must reflect a measure of compulsion beyond that inherent in the custody itself. *See Rhode Island v. Innis*, 446 U.S. at 300, 100 S.Ct. at 1689.

**21.** Tr. III, 45.

**22.** It appears from a reading of the language employed by the Court in *Rhode Island v. Innis*, 446 U.S. at 302, 100 S.Ct. at 1690, that whether a question or action is one reasonably likely to elicit an incriminating response is judged by an objective standard. Mr. Justice Marshall states this explicitly in his reading of the Court's opinion. *Rhode Island v. Innis*, 446 U.S. at 305, 100 S.Ct. at 1692 (Marshall, J. dissenting). *See also* White, *Interrogation Without Questions; Rhode*

*Island v. Innis* and *United States v. Henry*, 78 Mich.L.Rev. 1209, 1231–32 (1980) (*Innis* test turns upon objective purpose manifested by the police).

**23.** As supplemental authority, defendant's counsel cites *People v. Ferro*, 63 N.Y.2d 316, 472 N.E.2d 13, 482 N.Y.S.2d 237 (1984), *cert. denied*, — U.S. ——, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985), where the New York Court of Appeals held that confronting a suspect with evidence of the crime may constitute "interrogation" under the appropriate conditions. The conditions present in *Ferro* are not present in this case. In *Ferro*, the defendant was not only in custody, but also in a cell at the precinct station. The defendant had invoked his right to remain silent before he was confronted with the evidence. The evidence was placed outside his cell approximately one foot from the defendant. And the police knew the items placed outside the cell (furs stolen from the decedent's apartment) were evidence connected with the criminal acts. The circumstances in the instant case are not comparable to those in *Ferro*.

**24.** *See generally* W. LaFave & J. Israel, 1 Criminal Procedure § 6.7(a) (1984).

for an unforeseen answer to a straightforward question.[25]

AFFIRMED.

---

**25.** Defendant's counsel cites *Harryman v. Estelle*, 616 F.2d 870 (5th Cir.1980) (en banc), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). *Harryman* is distinguisable. There the officer, upon discovering a substance enclosed in a condom hidden on the defendant stated, "What is this?" The defendant responded, "Oh, you know what it is. It is heroin." *Id.* at 873. Thus, *Harryman* was a question—direct response scenario unlike the present case. While *Harryman* held that the response, made before *Miranda* warnings were given, was improperly used at trial, the case is not persuasive here.