953 F.2d 641
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dorthea Beverly ROSS, Defendant-Appellant.
 No. 91-5151.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 29, 1991.
Decided Feb. 4, 1992.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Herbert F. Murray, Senior District Judge. (CR-90-260-HM)
 Argued: Mary M. French, Baltimore, Md., for appellant; James Richard Alsup, Assistant United States Attorney, Baltimore, Md., for appellee.
 On Brief: Fred Warren Bennett, Federal Public Defender, Stephen J. Cribari, Deputy Public Defender, Baltimore, Md., for appellant; Richard D. Bennett, United States Attorney, Baltimore, Md., for appellee.
 D.Md.
 DISMISSED IN PART AND AFFIRMED IN PART.
 Before WIDENER and HAMILTON, Circuit Judges, and GERALD W. HEANEY, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Dorthea Ross was convicted of possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Two issues are raised on appeal. The first is whether the district court clearly erred in finding that Ross' consent to search her shopping bag was voluntary. The second is whether the district court erred in refusing to depart downward from the Sentencing Guidelines sentence. Finding no error, we affirm the judgment of the district court.
 
 
 2
 * On June 21, 1990, at approximately 9:00 A.M., special agents of the Drug Enforcement Agency ("DEA") were monitoring the arrival of the Garden State train from New York City at the Amtrak Station in New Carrollton, Maryland. As the Garden State train arrived, agents observed a young, black male exit the train. As he walked down the platform, he appeared very nervous, repeatedly looked at the agents, and then looked away. As he walked past the agents, he repeatedly looked back at them. One of the agents followed the young man down the escalator, stopped and questioned him.
 
 
 3
 Special Agent Doug Kahn remained on the platform, where he observed Ross exit the train from the same doorway the young man had departed. This piqued his interest. As Ross walked down the platform, Kahn noticed Ross was carrying a plastic shopping bag and no other luggage. Kahn saw Ross' mouth move from side to side as she walked down the platform.
 
 
 4
 Kahn watched Ross go down the escalator and meet with another woman at the bottom of the escalator. The two women put their arms around one another, and began to walk toward the exit of the Amtrak Station. Kahn, in plain clothes, approached Ross and the other woman. He identified himself as a police officer and asked if he could speak to them. Ross stopped, but the other woman, after pausing briefly, walked toward the exit. Kahn asked Ross if he could ask her a few questions and she replied that he could. Kahn asked Ross if she knew the other woman. Ross replied that her name was "Sharon." Kahn called out to Sharon and asked whether she knew Ross. Sharon turned and replied that she did not, and left the station.
 
 
 5
 Kahn asked Ross for identification. At this point, Kahn observed that Ross smelled bad, look disheveled and dirty, and slurred her speech. Kahn asked Ross about her travel plans and she replied that she was in New York for about one week visiting friends. When asked why she only had a shopping bag if she had been in New York for one week, Ross indicated that this was all she had. Ross responded to Kahn's questions clearly, although Kahn observed that Ross' speech was slurred. He believed that the slurred speech was caused by a deformity in Ross' lower jaw.
 
 
 6
 Kahn then explained that he was a DEA agent and that he was monitoring drug smuggling activity. Kahn asked if she had any illegal drugs with her and she replied no. Kahn then asked if she would mind if he searched the shopping bag she was carrying. Ross replied, "No, go ahead."
 
 
 7
 Kahn searched the shopping bag and recovered a clear plastic bag with about one hundred smaller, clear plastic bags inside. The smaller bags contained a white, rocky substance. A laboratory analysis revealed that the smaller bags contained 101.3 grams of 91 percent cocaine base. After Kahn's discovery, Ross became very upset and indicated that the drugs were not hers. Kahn placed Ross under arrest.
 
 
 8
 Kahn moved Ross to a more private and secure area and read her Miranda warnings. Kahn asked several times whether Ross understood those rights. Ross acknowledged that she understood those rights and asked if she could speak to an attorney. Kahn then frisked Ross in a protective search and found in one of her pants' pockets a glass pipe and a folded paper towel which contained 6.161 grams of 95 percent cocaine base. After acknowledging that she understood her Miranda rights, Ross told Kahn that she was to carry the drugs off the train for Sharon and the young, black male whose name was "T." As Kahn talked with Ross after her arrest and her acknowledgment that she understood her Miranda rights, Kahn observed that Ross answered his questions clearly. However, about five minutes after the arrest, Ross became very nervous, leading Kahn to suspect that she was under the influence of drugs. Ross indicated to Kahn that she had last used narcotics about one o'clock or two o'clock that morning, approximately seven to eight hours earlier.
 
 
 9
 As the agents began to drive Ross to their offices in Baltimore, Ross became ill. Ross told the agents that she was a diabetic and had a heart problem. The agents decided to take Ross to the United States Park Police office in Greenbelt, Maryland to further examine her and have a search of her conducted by a female officer. Ross eventually arrived in Baltimore and was admitted to the University of Maryland Hospital.
 
 
 10
 Ross moved to suppress, among other things, the drugs found in the plastic shopping bag and on her person. At the suppression hearing, the district court heard testimony from a psychiatrist, Dr. Neil Blumberg, and an expert in forensic psychology, David L. Shapiro, Ph.D. Dr. Shapiro diagnosed Ross as suffering from a moderate degree of long-term brain damage. In particular, Dr. Shapiro testified that Ross suffered from "perseveration," which, according to Dr. Shapiro, is:
 
 
 11
 a characteristic ... very frequently found in people who have brain damage, which is actually ... getting stuck in one kind of response set. Their [sic] thinking or responding to one particular kind of question, and they just keep, in essence, responding to that same question, or to that same task, even when something else is being asked of them, or their [sic] being asked to perform a different kind of task, they keep doing the same thing that they were doing before. They cannot in a sense flexably [sic] shift to a new task.
 
 
 12
 J.A. 155. Dr. Blumberg testified at the suppression hearing that Ross was significantly impaired at the time she gave consent to search her shopping bag.
 
 
 13
 In finding that Ross' consent to search was indeed voluntary, the district court found that there was no evidence of "perseveration" or fixation on any specific question or answer given by Ross. The district court principally relied on Ross' responsiveness to Kahn's questions, noting that Ross "was asked a variety of questions and responded in a manner that showed understanding of each question." Comparing this observation with the medical testimony, the district court, in denying Ross' motion to suppress, stated:
 
 
 14
 The Court has carefully considered the testimony of the experts in this case and recognizes that the defendant's possible brain damage and intoxication could have impaired her understanding to some extent. However, the Court is unable to conclude that her impairment was so great that her consent to the search was not the product of a rational intellect and a free will.
 
 
 15
 J.A. 243.
 
 
 16
 Following a jury trial, Ross was convicted of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Ross to 135 months in prison, followed by five years supervised release. Ross noted a timely appeal.
 
 II
 
 17
 Ross' first argument on appeal is that her consent to search the plastic shopping bag was not voluntary. The voluntariness of Ross' consent to search is a factual question determined in light of the totality of the circumstances and should be upheld unless clearly erroneous. United States v. Gordon, 895 F.2d 932, 938 (4th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 131 (1990).
 
 
 18
 The district court concluded that Ross' consent, under the totality of the circumstances, was voluntary. The district court acknowledged that Ross may have been under the influence of drugs and "was probably intoxicated at the time of her questioning and subsequent arrest," but concluded that Ross' demeanor and responsiveness at the time of questioning demonstrated that her consent was voluntary. We agree.
 
 
 19
 A consent search is valid if the government can "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). Whether a consent search is valid is based upon the "totality of the circumstances." Id. at 227. Some factors used in determining whether a consent to search was voluntary include: the consenter's age (youth), education (lack of), intelligence (lack of), the failure to advise the consenter of her constitutional rights or her right to refuse to give consent, the length of detention, and the length and nature of questioning. Id. at 226. In addition, the court should consider whether there were promises made to the consenter, whether the consenter was arrested or in custody, and whether the questioning occurred in a public or private place. United States v. Watson, 423 U.S. 411, 424 (1976). No single factor is dispositive. Id. The burden rests with the government to demonstrate that a consent to search was indeed voluntary.
 
 
 20
 Applying these factors, we conclude that the district court's finding that Ross' consent was voluntary was not clearly erroneous. There was ample evidence before the district court to demonstrate that Ross' consent was voluntary. Ross' demeanor and responsiveness were enough to support a finding that the consent was voluntary. In addition, the nature of the questioning was short and was in a public place. There was no evidence of force, coercion or duress. On the record before us, we cannot say that the district court's holding on the voluntariness of Ross' consent was clearly erroneous. See also United States v. Gay, 774 F.2d 368 (10th Cir.1985) (consent voluntary even though defendant was intoxicated, staggered, swayed and slurred his speech); United States v. Rambo, 789 F.2d 1289 (8th Cir.1986) (consent voluntary where the defendant was responsive to questions, even though nude, agitated, tense, wild-looking and had facial bruises).
 
 
 21
 Ross also argues that the district court did not employ the "totality of the circumstances" test, but created a rebuttable presumption that presumed consent and required Ross to present evidence that her mental impairment was so great that it vitiated her consent. We do not construe the district court's memorandum opinion in that manner. Ross' mental condition was simply one of the factors that the district court considered, as it was required to do, in determining whether Ross' consent was voluntary under the "totality of the circumstances." The district court completed this task and applied the appropriate standard in determining that Ross' consent was voluntary.
 
 III
 
 22
 The second argument raised by Ross is that the district court refused to consider her tragic personal background in determining whether a downward departure was warranted under U.S.S.G. §§ 5K2.0 and 5K2.13. At sentencing, Ross argued in favor of a downward departure for, among other things, her alleged chaotic upbringing and diminished capacity. In denying a downward departure for chaotic upbringing and diminished capacity, the district court noted:
 
 
 23
 [C]ounsel for the defense has asked for a downward departure of two levels for various reasons, namely, the alleged chaotic upbringing of the defendant, and also the fact that she is brain damaged. The Court doesn't feel that either one of those are reasons for a downward departure in this case. I have often stated in sentencing in criminal cases that it doesn't do any good for defendants to paint the difficulties they have had in upbringing and so on, because we sentence them on what the crime is, and what the defendant has done, not what the social environment may be. If we did that, that is, if we sentenced by way of the social environment, the person who had the most difficult time would be granted the most leniency, which would stand the criminal justice system on its head. So I don't intend to do that.
 
 
 24
 J.A. 308-09.
 
 
 25
 Generally, a defendant may not appeal a refusal to depart downward. United States v. Bayerle, 898 F.2d 28 (4th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 65 (1990). However, a defendant may appeal "if the refusal to depart downward was based on the district court's mistaken view that it lacked authority to depart." Bayerle, 898 F.2d at 31.
 
 
 26
 While the district court could have made more cogent findings, and should do so, we are of the view that the district court was aware of its authority to depart, but under the circumstances felt departure was unwarranted. Therefore, Ross may not appeal the district court's refusal to depart from the guidelines. Id. at 30-31.
 
 IV
 
 27
 For the reasons stated herein, the appeal from the district court's refusal to depart downward from the guidelines is dismissed and Ross' conviction and sentence are hereby affirmed.
 
 
 28
 DISMISSED IN PART AND AFFIRMED IN PART.