30 F.3d 142
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
David Thomas RHODES, Defendant-Appellant.
 No. 93-8083.
 United States Court of Appeals, Tenth Circuit.
 July 22, 1994.
 
 Before EBEL, KELLEY and BARRETT, Circuit Judges.
 
 
 1
 ORDER AND JUDGMENT*
 
 
 2
 David Thomas Rhodes (Rhodes) appeals from the judgment and sentence entered pursuant to a jury verdict finding Rhodes guilty of knowingly, intentionally, and unlawfully possessing with intent to distribute approximately 75 pounds of cocaine in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(A).
 
 
 3
 On September 25, 1991, the Converse County, Wyoming, Sheriff's Department received a REDDI report (Report Every Drunk Driver Immediately) on a van traveling north on Interstate I-25 north of Glendo, Wyoming. Wyoming Highway Patrolmen Becker and Poage and Deputy Sheriff Biel responded to the report and located the van at the Orin Junction rest area. Rhodes was asleep in the driver's seat. The van's motor was running.
 
 
 4
 Patrolman Becker awoke Rhodes and asked for and received his driver's license. Becker told Rhodes that he was following up on a REDDI report. Rhodes responded that he had not been drinking. Becker did not detect any odor of alcohol. Becker did observe, however, that Rhodes' "eyes were extremely pinpoint, tiny," and that, based on his training and experience, such a condition "could be caused by using a controlled substance." (R., Vol. III at 23).
 
 
 5
 At Becker's request, Rhodes accompanied him to his patrol car. Becker inquired about the ownership of the van, and Rhodes responded that it belonged to a friend. Becker then asked the dispatcher to run a National Crime Information Center (NCIC) record check on Rhodes while he performed a road-side sobriety test. Before Becker had completed the test, the dispatcher notified him that Rhodes was wanted on a California fugitive warrant.
 
 
 6
 Becker placed Rhodes under arrest and apprised him of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). In response, Rhodes stated that he did not want to talk to Becker. The evidence is in conflict as to whether Rhodes asked for an attorney at this point in time. Thereafter, Officers Becker and Poage inventoried the van in accordance with standard Wyoming Highway Patrol procedure. During the inventory, the officers observed an electric screwdriver and worn molding screws which caused them to suspect that drugs were hidden in the van. The officers also noticed that Rhodes had very little luggage. The officers did not discover any illegal substances or contraband during the inventory process.
 
 
 7
 The van was taken to a locked impound lot at a local wrecking yard in Douglas, Wyoming, and Rhodes was transported to the Converse County Jail where he was booked in by Deputy Biel. During the booking process, Biel asked Rhodes if he would allow the officers to search the van. Rhodes responded, "Yes, probably I would. Let me see the form." (R., Vol. III at 199). Biel did not show him the form at that time, id., but, according to Rhodes, told him, "[w]ell, if we decide that we want to go forward with this, we'll come back and ask you another day." Id. at 200.
 
 
 8
 The next day, September 26, 1991, Rhodes appeared in state court on the California fugitive warrant. At that time, Rhodes requested appointed counsel. Wyoming Assistant Public Defender Steve Kissinger was then appointed to represent Rhodes for the California fugitive warrant matter and a hearing was set for October 2, 1991. Following his appointment, Kissinger met with Rhodes and filed a discovery motion seeking, inter alia, "[a]ll reports, results, and data ... in connection with this defendant's case," and "[a] complete list of names, addresses and/or phone numbers of all witnesses ... interviewed, or interrogated as a result of this criminal prosecution." (R., Vol. I, Tab 59, Exhibit B, Motion For Discovery and Inspection).
 
 
 9
 On September 27, 1991, Deputies Biel and Kingrey interviewed Rhodes about the ownership of the van, during which Rhodes signed a Permission to Search form in which he acknowledged that: he had been apprised of his constitutional right not to have the van searched; he was voluntarily authorizing Biel and Becker to search "my motor vehicle;" and he was giving his written permission to search "freely and voluntarily, without any threats or promises ... and after having been informed by said officer that I have a right to refuse this search and/or seizure." See Appendix A.
 
 
 10
 A search of the van resulted in the discovery of approximately 75 pounds of cocaine located in three hidden compartments in the floor and a small amount of cocaine in a crumpled-up page inside a road atlas sitting on the front seat. Registration checks disclosed that the registered owner of the van was Jose Arroyave of Chicago, Illinois.
 
 
 11
 On November 22, 1991, Rhodes was charged in a federal one-count indictment with unlawful possession with intent to distribute approximately 75 pounds of cocaine, and he was formally arrested on this charge on November 26, 1991. Rhodes made his first appearance with court appointed counsel, Mr. Donald E. Miller, on December 4, 1991.
 
 
 12
 Prior to trial, Rhodes filed numerous motions and notices, including a motion to suppress the evidence found in the van, alleging, inter alia:
 
 
 13
 12. THAT on the 27th day of September, 1991, Officer Beil initiated contact with the Defendant and requested permission to search the van driven by Defendant. Defendant's court appointed attorney was not present and had no knowledge that Officer Beil was interrogating the Defendant. Officer Beil did not read Defendant his Miranda warnings on the 27th. The Defendant, after having demanded an attorney on two prior occasions and after having actually been appointed counsel, without advice of counsel, gave permission to Officer Beil to search the van.
 
 
 14
 13. THAT law enforcement officers violated the Defendant's Constitutional Rights as follows:
 
 
 15
 a. Officer Beil had no right or authority to detain or question Defendant at the rest stop. The Defendant had at all times operated his vehicle in a lawful manner, and at the time he was detained he had been parked in a lawful manner.
 
 
 16
 b. The initial detention was a pretextual stop. The government now contends that the stop was the result of a REDDI report, but the arresting officers failed to test or determine whether Defendant's ability to operate a motor vehicle was impaired.
 
 
 17
 c. Law enforcement continued to interrogate the Defendant after he had invoked his right to remain silent and requested an attorney on two separate occasions.
 
 
 18
 d. Law enforcement approached the Defendant and obtained his written consent to search the van after one; he had invoked his right to remain silent and had requested an attorney, and two; after he had been appointed an attorney. Law enforcement did not obtain either the Defendant's or his court appointed attorney's permission to speak with Defendant, much less obtain his permission to search the van. Such acts violated the Defendant's Fifth and Sixth Amendment right to an attorney as guaranteed by the United States Constitution....
 
 
 19
 (R., Vol. I, Tab 58 at 4-5).
 
 
 20
 Following a hearing, the court made detailed oral findings in denying Rhodes' motion to suppress, including:
 
 
 21
 First ... the initial detention was not pretextual but was a routine traffic stop based upon a reasonable suspicion that the defendant had been driving a vehicle under the influence of drugs such as alcohol or controlled substances and that it was a REDDI report and report of two truck drivers that the van had been driving erratically and almost forced them off the road which caused the stop. So I think there was no pretextual stop involved.
 
 
 22
 Second, there was no interrogation after the defendant invoked his right to remain silent, except that he was asked to consent to a search, which he gave voluntarily and without coercion, and he was also asked for a social security number, which he also gave. He had been read his Miranda rights at the time of his arrest and then he said that he didn't want to talk about it and he wasn't asked about it afterwards.
 
 
 23
 Third, the Defendant Rhodes gave both oral and written consent to search the van to Officer Becker and to Officer Biel. That--the defendant was not coerced into giving his consent.
 
 
 24
 The Court further finds that Becker had reasonable cause to search the van because of his suspicion that he had been driving under the influence of controlled substances based on reports of erratic driving and the absence of an alcohol smell on his breadth but with dilated pupils of the eyes and because of a call to Converse County asking about the whereabouts of the van. The court finds that no threats or coercion were used upon the defendant to obtain his written consent and that the defendant was not under the influence of any drugs at the time that he gave such consent.
 
 
 25
 The Court finds that the defendant read and understood what he signed, that he said he was not the owner of the van, that consent to search the van was given by the defendant unrestricted.
 
 
 26
 The Court further finds that the detention of the van was the result of a reasonable suspicion by Wyoming Highway Patrolman Becker that the defendant was engaged in criminal activity, namely, the possession and use of controlled substances; that the chain of custody was properly maintained; and that the van was validly impounded.
 
 
 27
 The Court further finds that the arrest of the defendant was lawful and was the result of probable cause based upon a report that he was a fugitive. The Court finds that Deputy Biel was not aware of Mr. Kissinger representing the defendant at the time he asked the defendant to sign a consent to search.
 
 
 28
 * * *
 
 
 29
 * * *
 
 
 30
 ... the Court finds that the defendant was not the owner of the van that was searched.... Whether or not the defendant had standing on that account is very doubtful in the opinion of the Court under U.S. v. Obregon, 748 F.2d 1371, Tenth Circuit case in 1984;
 
 
 31
 * * *
 
 
 32
 * * *
 
 
 33
 And, finally, based upon the totality of the circumstances, the Court concludes that the defendant's consent to search was voluntary and that the evidence should not be suppressed.
 
 
 34
 (R., Vol. III at 257-60).
 
 
 35
 The case proceeded to trial. Rhodes was convicted as charged and sentenced to twenty years imprisonment.
 
 
 36
 On appeal, Rhodes contends that: (1) he had standing to contest the legality of the search of the van which was later found to contain illegal drugs; (2) the written consent to search was the functional equivalent of an interrogation and/or statement and the fruits of the search should have been suppressed by the district court; and (3) his consent to the search, as determined by the totality of the circumstances, was involuntary based on the violation of his Fifth Amendment rights and the coercive and/or deceptive police actions.
 
 I.
 
 37
 Rhodes contends that the court erroneously ruled at the conclusion of the suppression hearing that he did not have standing to challenge the search of the van. It is fundamental law that a defendant attempting to suppress evidence discovered as a result of a police search must first establish that he had standing to object to the search. United States v. Salvucci, 448 U.S. 83 (1980).
 
 
 38
 Rhodes argues that "[i]n this case it is clear that [he] had standing to object to the search and there are no facts which need be developed further," and that "the only legal resolution based on the facts in this matter is that the district court's decision should be reversed and the 34 kilograms of cocaine suppressed."
 
 
 39
 (Appellant's Brief at 9). Rhodes points out that: he was the driver and sole occupant of the van when Patrolman Becker awoke him at the rest stop; he told Becker at that time that the van belonged to a friend, Jose Arroyave; Becker verified that Arroyave owned the van and that the van had not been reported stolen; and, Becker listed Arroyave as the owner when he inventoried the van on September 25, 1991. He argues that these circumstances established his standing to contest the legality of the search under United States v. Soto, 988 F.2d 1548, 1551 (10th Cir.1993) and United States v. Rubio-Rivera, 917 F.2d 1271 (10th Cir.1990).
 
 
 40
 In Soto, we held that a threshold issue in deciding a motion to suppress is whether the search violated the rights of the defendant and that "[t]his inquiry has evolved into a two-part test: The court must determine whether the defendant has exhibited a subjective expectation of privacy in the area searched, and also whether society is willing to recognize that expectation as being objectively reasonable." 988 F.2d at 1552. We also held, quoting Rubio-Rivera, 917 F.2d at 1275, that "[w]here the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle." Id. We further observed that "absent evidence that defendant wrongfully possessed the vehicle [evidence that the defendant had borrowed the car from his uncle, car was registered to uncle, and car was not reported stolen] is sufficient to confer standing on him to challenge the subsequent search of the car." 988 F.2d at 1553.
 
 
 41
 The government responds that although Soto "is the case most directly on point and at first reading appears to dictate resolving the standing issue in favor of [Rhodes] ... a closer analysis of this case indicates that the district court was correct in ruling that the Appellant did not have standing to object to the search." (Brief of Appellee at 22). The government contends that Rhodes failed to establish both prongs of Soto because he knew he was borrowing the van from a drug dealer; cars are merely tools of the trade for drug dealers; it was subjectively impossible for Rhodes to believe that he had any expectation of privacy in the van; and society should not recognize any expectation of privacy Rhodes may have had "based on [his] testimony that these cars are just driven all over the country, dumped off, and then later picked up by some other individual." Id. at 23.
 
 
 42
 Applying Rubio-Rivera and Soto to the facts herein, we hold that Rhodes had standing to challenge the search of the van. Rhodes told Patrolman Becker at the time of his arrest and he later testified at the suppression hearing and at trial that he had borrowed the van from a friend, Jose Arroyave. This testimony was uncontradicted. The government failed to rebut this testimony by evidence that the car did not belong to Arroyave, that the car had been reported stolen, or that Rhodes was operating the car without Arroyave's permission. Rhodes, having offered "sufficient evidence indicating that he [had] permission of the owner to use the vehicle ... plainly [had] a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle." Rubio-Rivera, 917 F.2d at 1275.
 
 II.
 
 43
 Rhodes contends that the written consent to search was the functional equivalent of an interrogation and/or a statement and that the fruits of the search should have been suppressed.
 
 
 44
 Rhodes points out that: he was advised of his Miranda rights on September 25, 1991, when he invoked his right to remain silent; once he had been "Mirandized" and invoked his right to remain silent, such right had to be scrupulously honored; he was not "re-Mirandized" prior to signing the Permission to Search on September 27, 1991; the Permission to Search was an admission that he had custody and control of the van and the functional equivalent of an interrogation and/or statement; and the Permission to Search established a chain of custody linking him to the van and the illegal drugs subsequently found therein. Based thereon, Rhodes argues that the district court should have found that his right to remain silent had been violated and that the court should have suppressed the Permission to Search form and the cocaine found in the van.
 
 
 45
 The government responds that the act of asking a defendant if he will consent to a search of the vehicle he is driving does not amount to interrogation. The government cites United States v. Gay, 774 F.2d 368 (10th Cir.1985), in which we, after observing the general rule that the need for Miranda warnings presupposes the existence of two conditions, custody and interrogation, held that the act of asking a defendant if he would consent to a search of the vehicle he was driving did not amount to interrogation. 774 F.2d at 379. The government further observes that "Rhodes' appointed attorney, Steve Kissinger, appeared at Appellant's initial appearance but was only appointed for [purposes of] the fugitive warrant," and "[t]herefore, at the time the request to search the van was made, Appellant's Sixth Amendment right to counsel, as to any other crime other than the fugitive warrant, had not yet attached." (Brief of Appellee at 12-13).
 
 
 46
 Miranda defined "interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." 384 U.S. at 444.
 
 
 47
 We agree with the government that under Gay the act of asking a defendant if he would consent to a search of the vehicle he was driving does not constitute an interrogation. Gay reasoned that a request to search "cannot be said to lead to an incriminating response," citing to W. La Fave and J. Isreal, 1 Criminal Procedure 6.7(a) (1984). Gay, 774 F.2d at 379. See also United States v. Parra, 2 F.3d 1058, 1067 (10th Cir.1993), cert. denied, ---- U.S. ---- (1993), (routine booking questions do not normally constitute interrogation because they do not normally elicit incriminating responses); United States v. Morris, 1 M.J. 352, 354 (1976) (implicit within an individual's consent to search is an acknowledgment, at the very least, of dominion and control over the property to be searched, but such an acknowledgment does not constitute an interrogation under Miranda ).[1]
 
 III.
 
 48
 Rhodes contends that his consent to search, as determined by the totality of the circumstances, was involuntary as the result of both the violation of his Fifth Amendment rights and coercive and deceptive police practices. "To admit evidence obtained in a consent search, a district court must find from the totality of the circumstances that (1) the defendant's consent to an officer's search was voluntary and (2) the search did not exceed the scope of the defendant's consent." United States v. Price, 925 F.2d 1268, 1270 (1991). See also United States v. Soto, 998 F.2d 1548, 1557 (10th Cir.1993); United States v. Nicholson, 983 F.2d 983, 988 (10th Cir.1993); United States v. Dewitt, 946 F.2d 1497, 1500 (10th Cir.1991), cert. denied, ---- U.S. ---- (1992).
 
 
 49
 a.
 
 
 50
 Rhodes contends that his Fifth Amendment rights were violated when, after he had invoked his right to remain silent and had asked for an attorney, "the Deputy Sheriffs initiated contact with him ... without his court appointed attorney; and they then failed to read him his Miranda rights and obtained an incriminating statement from him." (Appellant's Brief at 17). This issue was carefully considered and decided adversely to Rhodes in II., supra, and need not be revisited here.
 
 
 51
 b.
 
 
 52
 Rhodes contends that his consent to sign the Permission to Search was obtained by deception.
 
 
 53
 Officers may search an area without a warrant or probable cause when a person in control of the area has given his or her voluntary consent to the search. Schneckloth, 412 U.S. at 227-28; United States v. Mendenhall, 446 U.S. 544, 557 (1980), reh'g denied, 448 U.S. 908 (1980). The voluntariness of consent is a question of fact to be determined from the totality of the circumstances. McKneely, 6 F.3d at 1452. "Accordingly, we will not substitute our judgment for the district court's factual findings unless, viewing the facts in a light favorable to the court's determination, those findings are clearly erroneous." Id. In United States v. Griffin, 7 F.3d 1512, 1517 (10th Cir.1993), citing to Florida v. Bostick, ---- U.S. ----, 111 S.Ct. 2382, 2386 (1991), we held that an officer's request for consent to search does not taint an otherwise consensual encounter "as long as the police do not convey a message that compliance with their request is required." See also United States v. Lindsey, 877 F.2d 777 (9th Cir.1989) (voluntary consent found absent any police threats or coercion).
 
 
 54
 Rhodes argues that he did not voluntarily consent to the search and that he was deceived at the time he signed the Permission to Search because he had "relied on the fact that the initial inventory did not reveal any illegal substances," (Appellant's Brief at 25), and because "he had heard the dispatcher mention that there were no drugs found in the inventory." Id. at 26. Rhodes argues that, "as a result of the deception pertaining to the incriminating evidence which was found, or should have been found, on the front seat of the van," id. at 27, he did not make a free and deliberate choice in signing the Permission to Search, and his motion to suppress should have been granted.
 
 
 55
 Rhodes testified in detail during the suppression hearing relative to the circumstances under which he signed the Permission to Search. Thereafter, the district court made specific, detailed findings that: Rhodes gave both oral and written consent to the search; "no threats or coercion were used upon the defendant to obtain his written consent and that the defendant was not under the influence of any drugs at the time that he gave such consent;" and the "consent to search given by the defendant was knowing and voluntary." (R., Vol. III at 258-59).
 
 
 56
 We have carefully reviewed the suppression proceedings. We hold that the district court's findings are supported by the record and are not clearly erroneous. The district court did not err in denying Rhodes' motion to suppress.
 
 
 57
 AFFIRMED.
 
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [1]
 To the extent that Rhodes impliedly also alleges a Sixth Amendment violation, that claim is without merit. In contrast to a Miranda claim, the Sixth Amendment right to counsel is offense-specific. McNeil v. Wisconsin, --- U.S. ----, 111 S.Ct. 2204, 2207 (1991). Rhodes invoked his Sixth Amendment right to counsel when he appeared in state court on September 26, 1991 on the California fugitive warrant. However, when Deputies Biel and Kingrey interviewed Rhodes on September 27, 1991 about the ownership of the van, the encounter was unrelated to the fugitive charge. Accordingly, Rhodes' invocation of his Sixth Amendment right to counsel with respect to the fugitive charge poses no bar to the admission of evidence gathered after he consented to a search of the van