# IN THE SUPERIOR COURT OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY



STATE OF DELAWARE,

v.

MICHAEL IRWIN,

    Defendant.

ID No. 1309012464

STATE OF DELAWARE,

v.

DILIP NYALA,

    Defendant.

ID No. 1310000634

STATE OF DELAWARE,

v.

HAKEEM NESBITT,

    Defendant.

ID No. 1310018849

Submitted: September 30, 2014
Decided: November 17, 2014

On Defendant Dilip Nyala's Motion *In Limine* to Exclude Drug Evidence - **DENIED**

On Defendant Michael Irwin's Motion *In Limine* to Exclude Drug Evidence - **DENIED**

On Defendant Hakeem Nesbitt's Motion *In Limine* to Exclude Proffered Expert Testimony Concerning the Chemical Composition and Weight of the Substance Seized and to Exclude any Analyses, Reports or Tests Relied Upon in Rendering His/Her Opinion - **DENIED**

On Defendant Hakeem Nesbitt's Motion *In Limine* to Permit the Defendant to Exercise his Right to Confrontation and Cross Examine the State's Crime Lab Witnesses and Witnesses Within the Chain of Custody About the Investigation of the Operation at the OCME Crime Lab - **GRANTED IN PART, DENIED IN PART**

**OPINION**

Sarita Wright, Esquire;[1] Joseph Grubb, Esquire, Department of Justice, 820 N. French Street, Wilmington, DE 19801. Attorneys for State of Delaware.

Patrick J. Collins, Esquire and Albert J. Roop, Esquire,[2] Collins & Roop, 8 East 13th Street, Wilmington, Delaware 19801. Attorneys for Defendants Dilip Nyala and Michael Irwin.

Nicole Walker, Esquire and Beth Savitz, Esquire, Office of the Public Defender, 820 N. French Street, Wilmington, Delaware 19801. Attorneys for Defendants Hakeem Nesbitt and Braaheim Reed.

**CARPENTER, J.**

---

[1] Soon after briefing in this matter was completed, Ms. Wright passed away. The Court expresses its deepest sympathy to her husband and family as well as to her colleagues at the Department of Justice. She was a respected member of the Bar, and she embodied what it meant to be a "Delaware Lawyer" in all dealings with the Court.

[2] The Court wishes to express its appreciation to Mr. Collins and Mr. Roop for submitting an appendix that encompassed transcripts from both hearings and the relevant documents referenced in these proceedings. It encompassed three volumes and greatly aided the Court.

# I. **OVERVIEW**

On January 14, 2014, during a trial in Kent County Superior Court, it was discovered that drug evidence that had been in a sealed envelope stored at the Chief Medical Examiner's Office Controlled Substances Unit ("OCME drug lab") was missing, despite there being no appearance of tampering. The actual drugs that were seized had been replaced with blood-pressure pills. Following this discovery, the Office of the Chief Medical Examiner ("OCME") began an internal audit but was unable to explain how the event occurred. When more discrepancies were uncovered, Delaware State Police and the Department of Justice initiated a criminal investigation, which caused them to seize all evidence at the OCME drug lab and suspend all drug testing at that facility. All drug evidence was systematically removed from the OCME drug lab and transported to Delaware State Police Troop 2 ("Troop 2") where an audit was conducted by the Delaware State Police with the assistance of officers throughout the state. The subsequent investigation has uncovered multiple issues at the OCME drug lab relating to the storage of the evidence, security at the lab, documentation of the evidence's arrival at and movement within the lab, and other failures in protocol.

These issues were documented in a 36-page report issued by the Attorney General's Office on June 19, 2014.[3]

The investigation, although still ongoing, has thus far resulted in three OCME employees being suspended, two of those employees being indicted in this Court,[4] and the firing of the Chief Medical Examiner. However, the full extent of the criminal conduct at the OCME drug lab is still unknown.

The issues uncovered, and those anticipated to be revealed as the investigation continues, have prompted hundreds of motions from indicted and convicted defendants at all stages of the criminal process. In an attempt to logically and procedurally address these motions, the Court decided to first attempt to address cases that were awaiting trial. To do so, the Court reached out to the State and the defense bar to schedule hearings on pending matters within that category. With the professional coordination of all parties involved, the Court has held two hearings to gather evidence regarding the events at the OCME drug lab. The first hearing, which started on July 8, 2014, involved defendants Dilip Nyala ("Nyala") and Michael Irwin ("Irwin"). The second hearing, which was held in late August 2014, involved defendants Hakeem Nesbitt ("Nesbitt") and

---

[3] The Court notes that on pages 47 to 61 of the brief filed by Mr. Nyala and Mr. Irwin, counsel specifically reviews 13 cases identified in the Attorney General's report. While this information was provided to counsel, it was not introduced in the hearings and thus has not been considered by the Court.

[4] The indictments of these employees arose out of the OCME investigation by the Delaware State Police but were not directly related to the drugs missing from the OCME drug lab.

Braheim Reed ("Reed"). During that August hearing, testimony uncovered that evidence in the Reed case had a significant discrepancy between what the officers seized and what was actually tested at the independent lab retained by the State.[5] As a result, the State entered a *nolle prosequi* of the Reed case. Therefore, this Court's decision relates only to the Nesbitt, Irwin and Nyala cases.[6] By deciding these three cases the Court's intent is to establish a framework for addressing the volume of cases awaiting trial for drug offenses that at one time were stored at the OCME drug lab. The facts surrounding these specific cases involve drug evidence that was sent to the OCME drug lab for testing but was never actually tested by a chemist at that location. However, it is expected that the Court's ruling will also have an impact on cases where the drugs were tested by the OCME drug lab, and potentially the hundreds of petitions that have been filed pursuant to Superior Court Criminal Rule 61.

---

[5] NMS Labs, located in Willow Grove, Pennsylvania, was the independent lab used by the State after the OCME facility was closed. In the Reed case, fifty additional bags of heroin were received by NMS for testing than that allegedly seized by the police and counted by the officers during their audit.

[6] Subsequent to the hearing relating to the Nyala matter, another judge of this Court granted a Motion to Suppress. The State filed a Motion for Reconsideration which was denied on September 12, 2014. The State has subsequently certified that the evidence that was suppressed was essential to the prosecution and the State could not proceed without such evidence. As a result, the State requested the Court to issue a written order of dismissal pursuant to 10 *Del. C.* §9902(b) which was signed by the Court on September 18, 2014. Such action allows the suppression issue to be addressed by the Delaware Supreme Court. Counsel for Nyala has asked the Court to continue to include Nyala in this Opinion and to specifically address the OCME issue in the event the suppression decision is overturned by the Supreme Court.

Defendants are challenging the State's ability to use drug evidence at trial through filing various motions in limine. The Court will first highlight the specific factual and procedural background of each case, summarize guidance found from other jurisdictions facing similar drug lab improprieties, decide the principles to be used for cases involving drug evidence sent to the OCME drug lab and finally apply those principles to each specific defendant.

## II. FACTUAL BACKGROUND

### A. Michael Irwin

On September 17, 2013, the Delaware State Police arrested Irwin after he fled from an attempted traffic stop and was observed discarding suspected drug evidence, later identified as ecstasy, out of the window of his vehicle. Upon taking Irwin into custody, marijuana was also located in his car. On September 18, 2013, the Delaware State Police executed a search warrant at Irwin's residence of 2182 Washington Avenue, Elsmere, Delaware. During the search, the Delaware State Police located additional marijuana and ecstasy. Irwin was subsequently indicted by the Grand Jury on November 25, 2013 for drug dealing (ecstasy), aggravated possession (ecstasy), disregarding a police officer's signal, tampering with physical evidence, possession of marijuana, resisting arrest, drug dealing (marijuana), possession of drug paraphernalia, and endangering the welfare of a

6

child. The evidence seized from Irwin was properly documented and stored in the drug locker at the officer's troop until retrieved by Sergeant Scott McCarthy, an evidence custodian officer of the Delaware State Police.

Sergeant McCarthy was responsible for transporting evidence from the various Delaware State Police troops located in New Castle County to the OCME drug lab. Prior to transportation of the evidence envelopes, he would visually examine the evidence for signs of tampering and would enter an evidence submission report listing the evidence he intended to submit to the drug lab on that day into the OCME drug lab's Forensic Laboratory Information Management System ("FLIMS").

The evidence receipts generated in Irwin's case established that Sergeant McCarthy delivered the evidence in the case on two different occasions. The first occurred on September 24, 2013 at 1:10 p.m. and was turned over to Kelly Georgi, and a second submission was turned over on November 5, 2013 at 1:00 p.m. to James Daneshgar. Ms. Georgi and Mr. Daneshgar were both employed at the OCME as forensic evidence specialists whose duties were to receive evidence from officers and to secure and transfer the drug evidence to the chemist for testing. With these submissions, Sergeant McCarthy submitted the following evidence to the OCME drug lab for testing:

(a)   25.3 grams of ecstasy assigned number FE09736

(b)   2 marijuana blunts totaling .8 grams assigned number FE08433

(c)   An additional 30.9 grams of marijuana and ecstasy totaling 2.3 grams and were assigned number FE08434. However, the submission was split into two separate containers (A) for marijuana and (B) for ecstasy.

The submission receipt signed by the officer and an OCME drug lab employee reflects that the evidence initially submitted by Sergeant McCarthy was received on September 24, 2013, but it was not logged into FLIMS until September 30, 2013 at 12:19 p.m. As to the November 5th submission, the receipt and chain of custody documents reflect that Sergeant McCarthy delivered the evidence on November 5, 2013 at 1:00 p.m., but it was not entered into FLIMS until 4:10 p.m. on that date.

As the OCME investigation proceeded, the evidence in the Irwin case was moved to Troop 2 and an audit of the materials contained in the envelopes was conducted. Upon opening the envelopes the officers weighed the substances and confirmed there was no discrepancy from that noted by the arresting officer. Subsequent testing by the independent lab, however, resulted in a finding that the drug evidence submitted in the Irwin matter contained 16.01 grams of marijuana, a difference of 14.89 grams from the weight originally documented by the police.

8

## B. Dilip Nyala

On October 1, 2013, Wilmington Police officers received information from a confidential informant that an individual known as "Chin" was in possession of a semi-automatic firearm, and a revolver, and that he had recently received a large quantity of heroin. The informant described "Chin's" physical appearance and connected him to Building D at 2702 Eastwood Road, Manchester Arms Apartments in Elsmere. The informant also advised the officers that "Chin" distributed heroin while driving a silver 2012 Nissan Ultima and would keep the heroin in his girlfriend's second floor apartment in the 2700 block of West 5th Street in Wilmington. Upon receiving the information, the officers responded to the Manchester Arms Apartments and observed the Nissan Ultima parked in front of Building D. They subsequently ran the license tag of the vehicle and determined it was registered to Nyala and his mother and obtained a photograph of Nyala from his driver's license. The informant was subsequently shown the photograph and positively identified Nyala as "Chin."

During subsequent searches of Nyala's apartment, his girflriend's residence, as well as the Nissan Ultima, the officers discovered 17.14 grams of heroin contained in 857 bags, 2.6 grams of heroin in 130 bags, 48 grams of crack cocaine, 66 grams of marijuana, various drug paraphernalia and a 9 mm. semi-

automatic handgun together with a substantial amount of United States currency. Nyala was subsequently arrested and indicted on aggravated possession, drug dealing, possession of a firearm by a person prohibited, and possession of drug paraphernalia. The evidence seized from Nyala was taken to the Wilmington Police Department and placed in the Department's drug locker. Subsequently, the evidence control officer for the Wilmington Police Department, Corporal Arnold Lewis, who was responsible for storing, collecting and transporting the evidence seized by the Wilmington Police Department to the OCME drug lab, retrieved the evidence and logged it into the police's computer tracking system. In Nyala's case the drugs were divided into two packages with Package A indicating that it contained 48 grams of crack cocaine, 66 grams of marijuana and 17.4 grams of heroin. Package B indicated that it contained 2.6 grams of heroin.

Prior to transporting the evidence to the OCME drug lab, Corporal Lewis generated an evidence submission report and placed that information into FLIMS. From the evidence presented during the suppression hearing, it appears Corporal Lewis delivered the drug evidence in Nyala's case to the OCME drug lab on October 7, 2013 at 1:00 p.m. The evidence was received by Aretha Bailey, an administrative assistant at the OCME drug lab who was acting at the time as a forensic evidence specialist. Notwithstanding the evidence submission report to

10

the contrary, FLIMS reported that the evidence submitted by Corporal Lewis regarding this matter was delivered to the OCME drug lab on October 7, 2013 at 3:36 p.m. and was submitted to James Daneshgar. In response to the inconsistency, Mr. Daneshgar explained that Ms. Bailey received the evidence and would have placed it in the evidence locker until he had an opportunity to log it into the system.

As a result of the OCME investigation, the drugs seized from Nyala were subsequently removed from the OCME drug lab and taken to the Delaware State Police Troop 2 where the contents of the envelopes were audited. That audit noted no significant discrepancies and the drugs were subsequently forwarded to an independent lab for testing. The lab determined that the marijuana seized from Nyala weighed 52.96 grams which was 13.04 grams lighter than the initial weight noted by the officer. The lab also determined that the total heroin seized weighed 6.45 grams, 13.29 grams less than the original seizing weight, and the crack cocaine weighed 41.87 grams, a 6.13 gram deviation from the seizing weight.

### C. Hakeem Nesbitt

On October 29, 2013, the Delaware State Police responded to the area of 1213 West Avenue in New Castle for an alleged robbery in progress. They were advised that two black males had been fighting at a nearby gas station and it

11

appeared that a black handgun had been pulled by one of the individuals. The police were also advised that the armed suspect had run from the gas station toward the Super Lodge Hotel parking lot. The officers obtained a description of the individual with the handgun and proceeded to the hotel parking lot where they observed an individual matching the description. That individual, later identified as the defendant, Hakeem Nesbitt, was stopped and the officers immediately smelled a strong odor of marijuana from Nesbitt's clothing. A subsequent search of Nesbitt's pockets revealed 16 bags of a green leafy substance, believed to be marijuana, weighing 119.6 grams. The officers also discovered a room key for the Super Lodge Hotel. The hotel manager confirmed that Nesbitt had been staying at the hotel and a search warrant for Nesbitt's hotel room was obtained. During the search 1,271.4 grams of marijuana were found. Nesbitt was indicted on November 25, 2013 for drug dealing, aggravated possession of marijuana and possession of drug paraphernalia. On May 30, 2014, the drugs were sent to the independent lab for testing. The lab calculated the weight of the marijuana to be 1,194.62 grams which was 196.38 grams less than the amount allegedly seized by the police.

## D.    OCME Lab

The OCME drug lab was part of the overall facilities that housed the various functions of the Medical Examiner's Office at 200 South Adams Street in Wilmington and was a division of the Department of Health and Social Services. When the controlled substances from an arrest needed to be tested, a narcotics control officer from the arresting agency would take the drugs to the OCME drug lab[7] and a forensic evidence specialist or another lab employee acting in that capacity would review the evidence with the officer and prepare a receipt. The . receipt would be signed by the OCME employee who received the controlled substance as well as the officer who submitted it for testing. On the submission form, the date and time of transfer would be recorded as well as a listing of all the evidentiary items that were being turned over to the OCME lab. Once received at the OCME drug lab, the information regarding the evidence would be placed in the OCME laboratory management system known as FLIMS. Unique numbers would be assigned to the particular evidence submitted and the date and time when entries were made would be automatically populated when the information was inputted.[8] FLIMS was intended to track the evidence movements within the

---

[7] The larger police agencies had a regular date and time each week to submit evidence to the OCME drug lab. Smaller police departments in New Castle County would make an appointment with the lab, while a courier system was utilized for downstate departments.

[8] Information regarding the evidence that would be submitted by the arresting agency as well as the officer involved could also be front loaded into the system by the drug officer prior to physically turning the evidence over to the OCME lab. While some of that information relating to the arresting officer is also incorrect, it has no bearing on the

lab, and the information inputted would create the chain of custody documentation for that evidence.

Unfortunately, it was often the case that the date and time when the officer submitted the drug evidence was not the date and time reflected in FLIMS. It was common that drugs would be received by the lab, placed in its drug vault and then recorded into its management system at a later date. Since FLIMS automatically created the date and time when the information was inputted, the chain of custody documents were regularly incorrect. This was also true as to the employee that actually received the controlled substance from the officer. As an example, if one employee received the evidence but another employee actually inputted the information into FLIMS, the chain of custody document would reflect that the inputting employee was the one who actually received the substances.[9] While the blame for the delay in logging evidence was usually the workload of the employees of the lab, there also appears to be a complete lack of appreciation for the critical nature of the information they were recording.

Once the evidence was logged into FLIMS, the drugs were stored in a vault adjacent to the office. While the door to the OCME drug lab had unique security, as did the drug vault, the utilization of the security around these areas was lax at

issues to be addressed here.

[9] While there was a "note" provision in the system that would allow one to make a note of who actually received the evidence and when, it seems it was never utilized by staff.

14

best. Unauthorized individuals were allowed access to the area and at times the door of the vault would be left partially open as a convenience to employees going in and out of the vault. There was no written office policy or protocol for intaking evidence, and once evidence was transferred to the chemist for testing, those packages were allowed to be stored in the personal lab lockers assigned to each chemist. While a surveillance camera was available to record events that occurred in the drug lab, it appears it was not routinely monitored and no video evidence was introduced by the State to counter defendants' arguments as to the lack of security at this location.

When the Delaware State Police closed the OCME drug lab and removed the drug evidence from its vault, more than 700 pieces of "old" evidence that was unaccounted for in the case management system was discovered as well as rolls of evidence tape utilized by the various police agencies. No reasonable explanation was provided for these situations but clearly it would have assisted employees who were inclined to steal drug evidence from the lab. They could use unaccounted-for evidence as a substitute for what was stolen and use the tape color routinely used by that police agency to hide their entry into the drug envelopes.

The above, taken with the testimony regarding an absentee manager and the lack of oversight regarding the intake activities that were occurring within the OCME drug lab, together with the knowledge that most drugs tested by the lab would never be needed for trial, created a perfect storm for illegal conduct to occur.

At the hearing, counsel for Nyala and Irwin presented the testimony of Joseph Bono, an independent forensic consultant who previously served as the lab director for the United States Secret Service, and has held similar positions with the DEA and NCIS.[10]  Mr. Bono's report, supported by his testimony at trial, found that:

> [I]n the absence of an investigation to determine the "root causes" of the evidence breaches noted in the June 19, 2014 report issued by the Delaware Department of Justice entitled "Investigation of Missing Drug Evidence: Preliminary Findings," any evidence that was stored in the Delaware OCME Crime Lab is not sufficiently reliable to meet the standards for ensuring integrity as required by recognized forensic science accrediting bodies.[11]

He concluded that:

> In conclusion the situation at the OCME drug analysis laboratory, as documented in the June 19, 2014 Preliminary Findings, calls into question any reliability of reports or evidence handling procedures associated with purported controlled substances which passed through that laboratory.  With what is known up to this point, and

---

[10] Mr. Bono was also hired by counsel for Nesbitt but was not called as a witness during his hearing.

[11] Op. Mem. of Joseph Bono, Nyala and Irwin's Hearing Ex. 2 at pg. 2-3 ("Bono Report").

16

based on all of the documentation made available to me through various sources, there are serious concerns related to the veracity of any scientific results reported by the laboratory. There is no certainty, scientific or otherwise, that the evidence handling procedures in the OCME laboratory can be deemed reliable or can be trusted.[12]

Irwin and Nyala assert that since there was no contrary expert testimony presented by the State, Mr. Bono's testimony alone would support a finding by the Court that the drug evidence is sufficiently unreliable to allow submission at trial.

### E.    Audit

After the drug evidence was removed from the OCME drug lab to Troop 2 of the Delaware State Police, an audit of the evidence from more than 9000 cases was undertaken.[13] The review conducted by the Delaware State Police, with assistance from other police agencies, included the following:

1. A review of the outside of the envelope or container in which the controlled substance was located to determine if there were any observable rips, tears or other signs of tampering.

2. A review of the contents of the envelope or container by opening it to determine if it appeared to contain the drugs listed by the arresting officer. If so,

---

[12] *Id.* at pg. 10-11.

[13] To the Court this is an astounding amount of evidence being retained at the lab. Most drug cases are resolved within four to six months of indictment, and once the substance was tested or the case resolved, the drugs should have been returned to the police agency. This reflects a significant breakdown in communications between the agencies regarding the resolution of cases or retention policies that are simply out of date.

17

the contents were weighed and/or counted, depending upon what drugs were in the container.

3. Any discrepancies as to either the type of drugs, its weight or count would be noted on a form that had been created for the audit purpose.

4. The drug evidence would be resealed and the envelope or container would be returned to the evidence locker at Troop 2.

Discrepancies that were noted by the officers would be brought to the attention of a supervisor and a determination would be made by that officer whether it warranted further investigation.

When the audit process was initially instituted there was a meeting of some of the officers who were to participate for the purpose of outlining the procedures that were to be followed. However, there was no written direction or protocol, and the determination of whether there was a discrepancy was in large part left to the discretion of the reviewing officers. This was highlighted during the hearing when the officers who participated in the audit gave conflicting testimony as to what was considered a discrepancy and whether it needed to be reported to the supervising officers. In all three cases at issue here, the officers did not find a discrepancy that warranted further investigation.

## III. OTHER JURISDICTIONS

To aid the Court's analysis, it has reviewed cases involving crime labs that have experienced similar scandals throughout the country. Although it is unfortunate how often these issues have arisen, the Court was able to draw some insight on the issues from the actions taken in other jurisdictions to properly combat such abuses. In each of the jurisdictions where a lab scandal occurred, the common thread among them was the identification of the chemist or lab technician who actually committed the improper conduct. For example, in West Virginia, the actions of the West Virginia State Police Crime Laboratory's lead serologist were found to be so egregious over a ten-year period that the West Virginia Supreme Court ruled that:

> as a matter of law, any testimonial or documentary evidence offered by [that serologist] at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial . . .[14]

In Massachusetts, as a result of the conduct of a chemist, the Supreme Court created a conclusive presumption that the misconduct would have occurred in a defendant's case if that chemist signed a certificate of drug analysis as either the primary or secondary chemist in a defendant's case.[15] The conduct of the

---

[14] *In re Investigation of W. Va. State Police Crime Lab., Serology Div.*, 438 S.E. 2d 501, 506 (W. Va. 1993).
[15] *See Massachusetts v. Charles*, 992 N.E. 2d 999, 1003-05 (Mass. 2013).

19

chemist eventually led the Supreme Court of Massachusetts to appoint five retired

judges as special judicial magistrates to preside over criminal proceedings that

related to the lab at which the chemist was employed.

Similar cases have arisen in Texas, Florida, New York, Oklahoma, North

Carolina and California,[16] so the problem presented to the Court here is not

---

[16] In 2012, the Houston Police Department's Crime Lab discovered that one of their employees, Jonathan Salvador, had on at least one occasion used evidence from one case to support evidence in another case. The Texas Department of Public Safety identified 4,944 cases that Salvador worked on during his six-year tenure at the lab. All of the evidence handled by Salvador during the 90 day period surrounding the incident was re-tested and an additional 440 cases were also re-examined. In order to deal with Salvador's misconduct the court came up with the following rule to establish when an inference of falsity will be given to a piece of evidence:

> [I]f the applicant shows that: (1) the technician in question is a state actor, (2) the technician has committed multiple instances of intentional misconduct in another case or cases, (3) the technician is the same technician that worked on the applicant's case, (4) the misconduct is the type of misconduct that would have affected the evidence in the applicant's case, and (5) the technician handled and processed the evidence in the applicant's case within roughly the same period of time as the other misconduct. Once the applicant satisfies this initial burden by establishing the identified factors, the applicant has proven that… the errors could have resulted in false evidence being used in the applicant's case…. If Applicant can establish the necessary predicate facts, then the burden shifts to the State to offer evidence demonstrating that the laboratory technician committed no such intentional misconduct in the applicant's case. We realize that rebutting an applicant's successful claim that we should infer falsity will be an onerous burden, but we believe the burden is appropriate considering the egregious nature of the actions of Salvador.

(*Ex Parte Coty*, 418 S.W.3d 597, 598-605 (Tex. Crim. App. 2014)(internal citations omitted)).

In Florida, on February 4, 2014, chemist Joseph Graves of the Pensacola Regional Crime Lab was arrested on charges of grand theft, tampering or fabricating evidence and trafficking illegal drugs after the Escambia Sheriff's Office began an investigation into missing prescription pain pills from the evidence room. (*See State v. Graves*, No. 2014-CF-000457A (Fla. Escambia County Ct. filed February 5, 2014); Florida Dept. of Law Enforcement, Office of the Inspector General Review of FDLE Drug Chemistry Section Evidence Procedures & Protocols (March 31, 2014)).

In 2011, the Nassau County, New York crime lab was closed and the governor ordered Inspector General Ellen Biben to investigate the lab. Biben found dysfunctional leadership, management, inconsistent training among analysts, inconsistent and outdated procedures and failure in the monitoring of the lab. Hundreds of cases were placed under review and at least one has been vacated. However, the last review released to the public declared no evidence had been tainted and no discrepancies were found which would affect convictions. (*See* New York State Inspector General Investigation into the Nassau County Police Department Forensic Evidence Bureau (Nov. 2011)).

In Oklahoma, Joyce Gilchrist, a forensic chemist for the Oklahoma City Police Department was fired in 2001 for misconduct after being publicly scrutinized by courts for years. Although more than 1,700 cases were reviewed, no legal action was taken against Gilchrist by the state. (*See* Mark Hansen, *Crime Labs Under the Microscope After a String of Shoddy, Suspect and Fraudulent Results*, ABA Journal (Sept. 1, 2013), *available at*

unique to Delaware and unfortunately is all too common. However, what distinguishes those cases from the situation here is that those jurisdictions were able to identify who engaged in improper, and at times illegal, conduct and the Courts were able to create remedies when evidence was touched by that individual. Unfortunately here, to the extent that there are discrepancies between the drugs seized from a defendant and those tested by the lab, the individual possibly responsible for that conduct has not been identified. This is an important distinction because as best the Court can ascertain, and the parties have not provided evidence to the contrary, none of the cases in other jurisdictions that have led to the investigation of a particular crime lab have ever resulted in all of the evidence being found unreliable and inadmissible simply because that evidence was stored or tested at the lab that has been compromised. In addition, during the expert testimony of Mr. Bono during the hearing in Nyala and Irwin's matters, in response to the Court's inquiry, he too was unaware of any court

http://www.abajournal.com/magazine/article/).

In 2010, an independent audit revealed that the North Carolina State Bureau of Investigation's Forensic Lab had systematically withheld evidence in 230 cases over 16 years. After a review of all 230 cases, none were reopened. (*See* Chris Swecker & Michael Wolf, *An Independent Review of the SBI Forensic Laboratory* (2010) available at www.ncids.com/forensic/sbi/Swecker_Report.pdf).

In March 2009, San Francisco police shut down the crime laboratory's drug unit after an analyst was arrested for stealing cocaine from evidence. The technician was criminally charged. (*See* Craig M. Cooley, *Nurturing Forensic Science: How Appropriate Funding and Government Oversight Can Further Strengthen the Forensic Science Community*, 17 Tex. Wesleyan L. Rev. 441, 475 (2011); *see also* Jessica D. Gabel, *Realizing Reliability in Forensic Science from the Ground Up*, 104 J. Crim. L. & Criminology 283, 305 (2014)).

making such a broad or generalized finding. While this makes the cases here unique, it also makes it more difficult for the Court to decide how to best address the problems found at the OCME drug lab. The charges against the OCME employees that have occurred to date do not help identify the "root cause" at the lab and thus there is no obvious way to isolate the problems at the OCME drug lab.

Unfortunately, the Court cannot simply wait until the criminal investigations are complete and the individuals responsible have been identified. First, those involved may never be identified, and secondly, hundreds of cases, some in which the defendants are currently incarcerated, must be promptly resolved. They have already waited for the issue to be properly presented to the Court and waiting further simply is not legally acceptable or reasonable.

## IV. MOTIONS IN LIMINE

### A. Parties' Contentions

Although the motions for Nyala, Irwin and Nesbitt are titled differently, the foundation upon which they are all based is the same. That is, the mismanagement and the discovery of criminal conduct at this lab supports the conclusion that the underlying drug evidence in these criminal cases is unreliable and should be ruled inadmissible. In other words, they argue that the lab

conditions are so egregious, there is no way of ensuring that the drugs seized from the defendants by the police are the same drugs that have been tested by the lab. Counsel for Nesbitt tweaks this argument further by asserting that the evidence lacks the requisite scientific reliability required under *Daubert*[17] and since the underlying reliability of the evidence tested is in question, the Court should assert its gatekeeping function and exclude the chemist's testimony.[18] Obviously without such testimony the State would be unable to continue to pursue the drug charges against the defendants. In addition to these assertions, all of the defendants claim that even if the Court does not accept their unreliability argument, the State is unable to establish a reliable chain of custody to authenticate the drug evidence.

### B. Analysis

To first address the general admissibility of the evidence, it is important to separate the issues affecting admissibility from those that are simply reflective of an incredible deficiency in the oversight and management of this lab. Clearly, by any reasonable forensic standards relating to the management and operation of a lab testing controlled substances, this facility has failed. The lab had an

---

[17] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

[18] It is important to note, there is no assertion by Nesbitt that the testing by the independent lab was performed improperly or that the results of the testing are unreliable as to the identification of the substance. His *Daubert* argument goes to the reliability of what was tested and whether it relates to the defendant.

unreliable case management system and intake procedures that would regularly fail to accurately reflect when and by whom evidence was received, and it was operated by individuals who lacked the necessary training, expertise or professionalism to perform those functions. The employees here failed to appreciate or even recognize the critical responsibilities they had in safeguarding the evidence they received, or the consequences to the criminal justice system in failing to do so.

While the OCME facility was generally a secured building, the safeguards within the building were routinely bypassed or ignored by staff. This lack of security allowed employees to have, at times, unimpeded and unsupervised access to evidence lockers providing a near open door to those who wanted to steal for personal pleasure or economic gain. This, together with an absentee manager and a lack of clear procedures and protocols, created opportunities that were simply too tempting for an unscrupulous or compromised employee.

A lack of management also created in essence a warehouse of uninventoried drug evidence that was maintained at the OCME drug lab even after the criminal case was completed. This provided access to drugs that were no longer needed by the police or prosecutors opening a door where unaccounted-for drugs could be utilized to foster criminal conduct without fear of being

discovered. As a result of the conditions found at this lab, it should not be surprising to anyone that the criminal conduct discovered to date occurred, or that the unmonitored circumstances have allowed others to go uncharged.

There should be no question that the Court finds the conduct here to not only be outrageous, unacceptable and a violation of a public trust, it also warrants a full investigation and review by professional lab managers with their suggestions as to the best practices to operate this lab being fully implemented by the State. The reliability and confidence in the State's ability to perform this critical function has been severely damaged and the citizens of this State deserve nothing less than a lab that will meet or exceed the best practices for this industry. There are hundreds of officers who put their lives in jeopardy every day to enforce our drug laws, and the actions of OCME has put those cases in jeopardy. The cost to the criminal justice system has been enormous and a simple change in who manages the facility or creating some written procedures simply will not suffice.

That said, the question is not whether the lab was in disarray and mismanaged, as everyone, including the Court, agrees that it was. The question now is what effect that should have on the admissibility of drug evidence in criminal cases. At times this question has gotten lost in the forest of information

gathered regarding the improper operation of this lab. To answer this question it is also important to understand what is not present here. There is no evidence to date to suggest that proper testing of drugs submitted did not occur, or that the chemists were submitting false reports, or that critical evidence was withheld by the lab, or that there was any misconduct by the police in violation of a defendant's rights. When the smoke clears, what we have is a lab that suffered from systematic failures in protocol resulting in evidence being stolen, for either sale or personal consumption, and in some instances replaced with other drugs. While the defendants urge this Court to find that any evidence stored at the OCME drug lab is *ipso facto* unreliable due to a lapse in management and protocol, the Court finds that such a blanket ruling is inappropriate. While the circumstances here clearly justify greater scrutiny and review of the evidence presented in the courtroom, the Court does not find it justifies a wholesale suppression of all drug evidence seized by law enforcement over the past several years. The Court believes that even Mr. Bono, the expert retained by Nyala and Irwin, would find that extreme. The foundation of his opinion rests on the inability to identify a particular culpable individual and it is only because one has not been identified that he opines all evidence at the lab is suspect. The Court shares his frustration but does not find credible a suggestion that all cases have

26

been tainted. That conclusion is not supported by the evidence and is simply wrong.

There are clearly cases, perhaps the majority of cases, that went to the OCME drug lab, where in spite of the problems documented during the hearing, there is no evidence to suggest that the drug evidence had been tampered with or altered in any way. To deny those cases their day in court would be an injustice that simply cannot be justified. That said, given the sheer magnitude of the issues that plague the OCME drug lab, it would be equally unfair to allow cases to be tried in a sterile proceeding as if this conduct never occurred. Therefore, a fair balance of these concerns needs to occur.

The decision whether to admit evidence in particular circumstances is generally within the trial judge's discretion.[19] Under Delaware Rule of Evidence 901, the party offering the evidence at trial must present "evidence sufficient to support a finding that the matter in question is what its proponent claims."[20] The State may authenticate an item offered as evidence by either having "witnesses visually identify the item as that which was actually involved with the crime," or by "establish[ing] a 'chain of custody' which indirectly establishes the identity

---

[19] *See Tricoche v. State*, 525 A.2d 151, 152 (Del. 1987).
[20] D.R.E 901.

27

and integrity of the evidence by tracing its continuous whereabouts."[21] As a general rule, since drug evidence does not have any unique characteristic that would distinguish it from other drugs, the Court has utilized the chain of custody process to ensure reasonable probability that the evidence proffered has not been misidentified or altered. When chain of custody is used to establish the admissibility of evidence, the Court must determine "whether there is a reasonable probability that the evidence offered has been properly identified and that no adulteration or tampering occurred."[22] While the State is required to authenticate the evidence proffered and eliminate possibilities of adulteration or tampering, their burden is not to "prove beyond all possibility of doubt the identity of the evidence or the improbability of tampering; it need only prove that there is a reasonable probability that no tampering has occurred."[23] Any "alleged deficiencies or 'breaks' in the chain of custody go to the weight of the evidence rather than to its admissibility."[24] The Court continues to believe this time tested process is an appropriate manner to test the authenticity of evidence when it is attempted to be introduced in cases where the drugs went to the OCME drug lab. This will allow for an individualized review of the circumstances surrounding

---

[21] *Whitfield v. State*, 524 A.2d 13, 16 (Del. 1987).

[22] *Murphy v. State*, 632 A.2d 1150, 1153 (Del. 1993).

[23] *Tatman v. State*, 314 A.2d 417, 418 (Del. 1973)(citing *Clough v. State*, 295 A.2d 729 (Del. Super. 1972)).

[24] *Baker v. State*, 551 A.2d 825 (Del. 1988) (TABLE) (*citing United States v. Gay*, 774 F.2d 368, 374 (10th Cir. 1985)); *see also State v. Croce*, 1997 WL 524070, at *3 (Del. Super 1997).

28

each case, including an analysis of that case's preservation and custody while at the OCME drug lab and whether that evidence suggests a likelihood the drugs have been tampered with.[25] Once the Court has found the evidence has been sufficiently authenticated, it allows the jury to determine the significance of any evidentiary discrepancy and the weight to give it.

Over the years, to assist in this process, the General Assembly has passed legislation to define what witnesses are required to sufficiently establish the chain of custody[26] and when the testing chemist is required to actually testify.[27] Given the outrageous conduct uncovered during the hearings in these matters, it is difficult to envision that the underlying premise that supported these "shortcuts" can be justified in the OCME drug lab cases. Certainly the parties would have to agree that any certification coming from the OCME, as required by the statute, would under the circumstances, be suspect. As such, while the Court finds that requiring the State to clearly establish a chain of custody continues to be the fair way to determine the admissibility of drug evidence, these cases are far from the norm, and the Court believes more is required. Thus, the Court finds in cases

---

[25] *Whitfield v. State*, 524 A.2d at 16 ("Factors relevant in a chain of custody analysis include 'the nature of the article, the circumstances surrounding its preservation in custody, and the likelihood of intermeddlers having tampered with it." (internal citations omitted)).
[26] *See* 10 *Del. C.* §4331.
[27] *See* 10 *Del. C.* §4330.

29

where the evidence was submitted to the OCME drug lab, some enhanced procedures should be required.

While the law generally does not require the State to present a perfect chain of custody to authenticate evidence, even the State has acknowledged in its report dated June 19, 2014 that there were "systematical operational failings" including lack of management, oversight, security, and the lack of effective policies and procedures at the OCME drug lab. As such, there is no question that the improprieties at the lab have raised significant questions regarding whether the drug evidence submitted at the lab could have been altered or tampered with. While the State still is not required to prove the chain of custody "beyond all possibility of doubt" as it relates to the probability that the evidence was tampered with, the Court finds that because of the improprieties discovered at the OCME drug lab, in order for the State to meet the burden of "reasonable probability" a more complete chain of custody is required.

Therefore, in these cases, for the evidence to be admitted the State will be required to call all available witnesses in the chain of custody from the time the evidence was submitted to the OCME drug lab until it was taken from Troop 2 and sent to the independent lab for testing. The use of "available" instead of all to describe the required chain of custody is done only because the Court recognizes

that due to the continuing criminal investigation of the OCME drug lab, on occasion an employee or former employee of OCME may refuse to testify in fear of incriminating themselves. If this occurs, it would not prevent the State from meeting their authenticity obligations set forth in this Opinion but will open the door for the defendant to present evidence regarding the OCME investigation as it relates to the role that employee played in the receiving and handling of evidence at the lab. Of course, the decision whether to continue to pursue those cases remains within the discretion of the Attorney General's Office.

While at first blush this may seem burdensome, the Court is confident, based on the evidence presented at the hearings, that the individuals involved in the chain of custody can be reasonably identified and their contact with the evidence established. The Court recognizes this is beyond what is normally required to establish a chain of custody and it wants to be clear, this requirement only applies to drug cases that were sent to the OCME drug lab and are awaiting trial. It is not the Court's intent to generally change the chain of custody requirements but, under the unique circumstances here, the Court believes that fairness requires a higher obligation to authenticate the drug evidence.

With this ruling, the "auditing" officers are now a part of the chain of custody that the Court has ruled must be established and the Court is concerned

31

that their conclusions, if presented at trial, would perhaps unfairly influence the jury's determination of the reliability of that evidence. The significance of the audit was a concern to counsel at the hearing as well as in the briefing that followed. It is certainly clear to the Court that the audit performed by the police was not consistent with any reasonable forensic review of the evidence. There were no standards or guidelines established and no forensic expert was consulted to ensure compliance with standards for such a review. The oversight process was inconsistent, and the significance of the findings by the audit team, to a large degree, depended upon the supervisory officer on duty that day. Without consistent guidelines, the determination of whether there were any discrepancies from the original description of the evidence was left to the discretion of the auditing officers.

But what is lost in the arguments made by counsel is the underlying purpose of this audit. The Delaware State Police had opened a criminal investigation regarding the activities at the OCME drug lab, in particular regarding the theft of controlled substances at that facility. The unmistakable intent of the audit here was to determine whether there were other cases that reflected discrepancies that would be evidence of criminal conduct. This was by no means a scientifically conducted forensic audit or inventory of the evidence

32

maintained at the lab, but was simply an investigative effort to determine the extent of the criminal conduct that was yet to be disclosed. Therefore, from the Court's perspective the results of the officers "audit" have no significance in the admissibility of the evidence. The officers finding of "no discrepancy" is not conclusive of anything and certainly has no evidentiary value.

Because of this, in drug cases that went to the OCME drug lab and were part of the audit process, the Court believes it would be inappropriate to allow counsel to solicit from the auditing officers in their case in chief any indication as to their findings. If for some reason, unfathomable to the Court at this moment, defense counsel wanted to explore this area, the State then may request permission to rebut any improper suggestions made by counsel's questions. Frankly, the Court would strongly urge counsel to stipulate that during the transfer of the drugs to Troop 2, following the shutdown of the OCME drug lab, that additional officers assisted in the transfer but the parties have agreed they are not required to testify regarding their handling of the evidence. This would alleviate the issue and any potential unfair weight the jury may give to an unsolicited comment during the auditing officers' testimony.

The Court next will require the State in each case that proceeds to trial to test at a minimum the amount of drugs that correspond to the tier level for which

33

that Defendant is charged with committing. In other words, the drugs that were allegedly seized from the defendant must be completely tested for the given weight, or volume, for which the State is proceeding to trial.

The final issue raised in the motions filed with the Court in these cases is to what extent the parties may question the witnesses or present evidence regarding the investigation of the OCME drug lab during the trial. Beyond the testimony presented during the hearings, the parties have the unusual presentation of a report from the Attorney General's Office outlining problems at the OCME drug lab found by their investigation. During the hearings, the State presented explanations for some of the discrepancies that have occurred between what was seized by the police and what has been found in subsequent examination by the outside lab. Those explanations include the use of different scales, the officers' use of standardized measurements to determine weights, the natural reduction in weight of some material due to decompensation, police error and the destruction of some of the evidence during testing. Any of these conclusions may provide a reasonable explanation of a particular discrepancy, and it is fair, appropriate and necessary for the State to present such evidence to establish its burden of proof. However, it does not eliminate the alternative possibility that a discrepancy is the result of drugs being mishandled or stolen as a result of the mismanagement at the

34

OCME drug lab. As such, it would be equally unfair to prohibit the defense from reasonably exploring, with witnesses, the OCME investigation as an explanation for a reduction in weight or for some other discrepancy in the evidence. Obviously, the benefit of that testimony will depend upon the unique facts of each case and the litigation strategy of counsel. In cases where the discrepancy in the evidence is not significant and a reasonable explanation has been provided, it is likely the fact that an OCME investigation occurred will have little impact, and pursuing such questions may actually diminish counsel's credibility before the jury. In other cases, where the discrepancy is more significant, it may have a much greater impact.

While the Court has no intention of limiting the discretion given the trial judge under Delaware Rule of Evidence 403,[28] regarding the extent of questioning that will be allowed relating to the OCME investigation, it does believe that fundamental to the introduction of such evidence is its relevance under Delaware Rule of Evidence 402.[29] The Court expects that in the vast majority of cases there

---

[28] Delaware Rule of Evidence 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.
[29] Delaware Rule of Evidence 402 provides:
All relevant evidence is admissible, except as otherwise provided by statute or by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.

35

will be a discrepancy between what the officer indicated he seized and what is indicated by the report from the testing laboratory. And as previously indicated, in those cases, the Court believes it is fair to allow evidence into the trial regarding the OCME investigation. However, there will be cases in which there is no evidence of tampering and the evidence seized and tested reflects no disparity, making the OCME investigation not only irrelevant but would clearly be either confusing or misleading to the jury. As a result, the Court believes it is appropriate to establish a bright line that must be crossed before allowing questioning regarding the investigation. Therefore, the Court has decided that if a case was sent to the OCME drug lab for testing, the defense will be free to question the State's witnesses or to present evidence regarding the OCME investigation only if there is either evidence of tampering of the packaging submitted by the police or a discrepancy in weight, volume or contents from that described by the seizing officer. If evidence of tampering is not present and there is no discrepancy, the OCME investigation is not relevant under Delaware Rule of Evidence 402 or at least would be misleading and unfair under Rule 403. In such cases, therefore, evidence of the investigation should not be introduced.

In creating this bright line, the Court recognizes that discrepancies in weight and volume are not uncommon in drug cases regardless of whether the

evidence had any connection to the OCME drug lab. The Court considered attempting to create definitive lines for the admissibility of the OCME investigation specific to each type of drug based upon what would be a reasonable deviation in weight or volume for that drug. However, the Court found it could not reasonably do so because of the multitude of factors that could affect those values. Unfortunately, the bright line created by this Opinion will undoubtedly lead to the OCME drug lab investigation door being opened to defense counsel in more cases than perhaps appropriate. However, the reasonable safeguard here is not in whether it is admissible but the extent it is admitted. While the Court expects the bright line regarding the admissibility of the OCME investigation to be generally accepted and followed by the Court, each case is unique and the discretion to limit the extent of the evidence regarding the OCME investigation remains with the trial judge. They will be in the best position to gauge to what extent such evidence is appropriate based upon the facts of the case they are trying and the circumstances that arise during the course of the trial.

That said, the universe of these cases remaining to be tried is not significant and this judge encourages his colleagues to recognize that fairness dictates that there be some leeway given to strike a reasonable balancing of the explanations given to the jury so that they may weigh the evidence and determine

whether they are convinced that the drug evidence offered at trial is that which was seized by the police from the defendant.

## V. **APPLICATION TO NESBITT, NYALA AND IRWIN**

The primary focus of counsel at the two hearings in these matters was to present the circumstances surrounding the mismanagement and inappropriate conduct at the OCME drug lab to the Court, and to show why those circumstances suggest the drug evidence against them should be ruled inadmissible. In doing so, many of the witnesses that the Court, by this ruling, has indicated must testify at trial did so at the hearing. However, the parties did not have the benefit of the Court's ruling or knowledge of the enhanced burdens created by this Opinion, therefore it would be unfair at this juncture to make any additional ruling beyond deciding the motions in limine. These cases will, unless resolved beforehand, proceed to trial before this judge and the State will have its opportunity to fully comply with the requirements of this Opinion. Since the evidence as to each of the defendants here has established discrepancies in the amounts allegedly seized by the police and that tested by the independent lab, the defendants will be given an opportunity to explore this difference including cross-examining witnesses about the OCME investigation or presenting such evidence in their cases if they find appropriate.

## VI. CONCLUSION

The situation that developed over time at the OCME drug lab that led to the overall investigation has had a profound effect on the criminal justice system. Important drug cases have been placed in jeopardy; other cases have been dismissed or were allowed to plea to reduced charges; extensive judicial resources to address the issues have and will continue to be utilized; many incarcerated defendants have waited while the issues were appropriately litigated; and significant resources have been expended to test drug evidence at other labs. The conditions at the OCME drug lab have had significant consequences for the prosecution efforts of the State, and the Attorney General's Office has had to defend an entity managed by another state agency in which it had no control or administrative oversight. Regardless of the decisions made here, there are no winners in this situation. While this Opinion may make some cases difficult to prosecute, the Court believes it has struck a fair and appropriate balance of the issues presented by the parties.

Since the Court is not willing to conclude that the conditions at the OCME drug lab mandate a finding that all evidence stored at the location was unreliable, Dilip Nyala's Motion *In Limine* to Exclude Drug Evidence; Michael Irwin's Motion *In Limine* to Exclude Drug Evidence; and Hakeem Nesbitt's Motion *In*

*Limine* to Exclude Proffered Expert Testimony Concerning the Chemical Composition and Weight of the Substance Seized and to Exclude any Analyses, Reports or Tests Relied Upon in Rendering His/Her Opinion is hereby **DENIED**.

The Motion *In Limine* to allow the defendants here to cross-examine the State's lab and chain of custody witnesses regarding the investigation and operation of the OCME drug lab is, consistent with the rulings set forth in this Opinion, **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

_____
Judge William C. Carpenter, Jr.