# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs October 25, 2016

## STATE OF TENNESSEE v. MARIO CRUZ ESTRADA

**Appeal from the Circuit Court for Lawrence County**
**No. 32502    Stella L. Hargrove, Judge**
_____

**No. M2016-00056-CCA-R3-CD – Filed November 30, 2016**
_____

The defendant, Mario Cruz Estrada, was convicted of attempted second degree murder for which he received a sentence of twelve years in confinement. The defendant appeals his conviction challenging the trial court's denial of his request for a jury instruction on the defenses of self-defense and defense of another and the admission of certain evidence. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

J. ROSS DYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

William M. Harris, Lawrenceburg, Tennessee, for the appellant, Mario Estrada.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Gary Howell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts

On January 1, 2014, the victim, Charles Davis, and his wife, Tasha Davis, lived with their four children on Rabbit Trail Road in Lawrence County, Tennessee. Mr. and Mrs. Davis additionally cared for the four year-old and infant daughters of Ms. Davis's

sister, Crystal Carranza. Ms. Carranza was about to begin a one-year incarceration and could not care for her children herself.

That day, Ms. Carranza's four year-old daughter spent the day with her grandmother. After the visit, Ms. Carranza and the defendant, Ms. Carranza's new boyfriend, brought the child back to the Davis's home. The victim was leaving to visit his mother at the time and noticed the defendant driving with a forty-ounce beer in his hand. Despite his disgust, the victim continued leaving and went to his mother's house. According to Mrs. Davis, when Ms. Carranza and the defendant arrived, Ms. Carranza was "high" and the defendant was holding two forty-ounce beers.

When the victim returned, he found the defendant and Ms. Carranza still at his house. The defendant was sitting on the arm rest of the couch, Ms. Carranza was on the floor beside him, Ms. Davis was in the kitchen, and the kids were "everywhere." As the victim settled into his chair, the defendant told him "I'm teaching your kids to fight." The victim responded by telling the defendant that he did not appreciate that. When the defendant apologized for being disrespectful, the victim stated, "Well it's very disrespectful to be pulling up in my drive way with my niece in the car drinking and driving. I don't appreciate that at all." The defendant did not respond and simply

lowered his head. However, the victim continued, "Look I just want you all out of my house. I'm going to the back here into the bathroom and y'all need to leave. And you're not taking the kids with you."

As the victim walked towards the bathroom, Ms. Carranza yelled, "Which would you rather do, him drink and drive or me drive without my glasses." The victim responded "Neither one." Ms. Carranza then followed the victim into the bathroom, shoved him in the back, and asked "What are you going to do." The victim turned to face Ms. Carranza, and she began hitting him with both fists. In an attempt to both protect himself and calm her down, the victim grabbed both of Ms. Carranza's fists, crossed her arms across her chest, and laid her on the ground. According to the victim, Ms. Carranza stopped talking and fighting with him at that point.

While kneeling over Ms. Carranza, the victim felt something "like slapping on my neck." He looked up to see the defendant standing behind him and a knife blade coming towards him. In an attempt to protect himself, the victim picked the defendant up on his shoulders, running him into the wall, and carried him into the bedroom. As the two continued to struggle, the victim called out for help and the defendant continued to stab

him. Once the victim was able to grab and control the defendant's hand, the defendant stopped. The next thing the victim remembers was waking up in Vanderbilt Hospital.

The defendant and Ms. Carranza fled the house in a maroon minivan. Ms. Davis followed them and found a neighbor to call 911. Ms. Davis then returned to the house to care for her husband. The victim was unresponsive when Ms. Davis first returned to the house. Though she was able to revive him, all the victim could say was that he was cold.

Investigator Blake Mayes, with the Lawrence County Sheriff's Department, arrived at the scene first. Inv. Mayes found the victim lying on the floor in the bedroom covered in blood. Ms. Davis told Inv. Mayes that the victim had been attacked by the defendant, and the defendant and Ms. Carranza fled in a maroon minivan. Inv. Mayes issued a "be on the lookout" ("BOLO") notice for the defendant and the van.

After leaving the scene, Inv. Mayes received a call from the Maury County Sheriff's Department. Inv. Mayes learned the defendant and Ms. Carranza had been apprehended and their bloody clothes had been collected.

4

Deputy Chris Webster, with the Maury County Sheriff's Department, was on patrol when he received a BOLO for a maroon van leaving Lawrence County on Highway 43 and occupied by the defendant. The BOLO also advised that the defendant might be headed to a residence on Williamsport Pike. Shortly after receiving the information about the defendant, Deputy Webster heard other officers on the radio stating that they had spotted the vehicle and were in pursuit. Based on the direction of the pursuit and the fact that he was located between the pursuing officers and the residence on Williamsport Pike, Deputy Webster took a position at the Williamsport Pike exit of Highway 43 in an attempt to stop the defendant.

As the fleeing defendant and the pursing officers approached Deputy Webster's position, the mini-van refused to stop and instead accelerated, crashing into the side of Deputy Webster's vehicle and pushing it out of the way. After the other officers passed his location, Deputy Webster joined the pursuit.

The fleeing mini-van finally turned into a subdivision and came to a stop. The defendant immediately exited the vehicle and began to flee on foot. Deputy Webster also exited his vehicle and pursued the defendant. When the defendant slipped on wet grass, another officer deployed his Taser, and the defendant was taken into custody. According to Deputy Webster, the defendant's clothing was covered in blood. Deputy Webster also testified that he took pictures of the defendant and his bloody clothing at the scene.

Maury County Sheriff's Deputy Chris McDougal arrived on the scene just as the defendant was exiting the vehicle and fleeing on foot. After the defendant was apprehended, he was placed in Deputy McDougal's vehicle and transported to the Maury County Jail. According to Deputy McDougal's log, he left the scene at 10:48 p.m. and arrived at the Maury County Jail at 10:54 p.m. Upon arriving at the jail, Deputy McDougal immediately "took the defendant straight to booking."

About an hour later, Deputy McDougal was tasked with delivering the defendant's clothing to the Lawrence County Sheriff's Department. According to Deputy McDougal, he received a brown paper Piggly Wiggly grocery bag from the booking officer and

immediately drove to meet Inv. Mayes of the Lawrence County Sheriff's Department. According to Deputy McDougal's log, he was in route to meet Inv. Mayes and deliver the clothing at 11:56 p.m. Inv. Mayes corroborated Deputy McDougal's testimony stating that he received the clothing in a brown paper Piggly Wiggly grocery bag and immediately placed it in the temporary evidence locker.

Dr. Laura Boos, an expert in the field of DNA analysis and an employee of the Tennessee Bureau of Investigation, compared blood samples of the victim to blood stains found in the minivan and on the defendant's clothing. All items tested by Dr. Boos were positive for blood and contained the DNA profile matching that of the victim.

*Analysis*

**I.      Jury Instruction – Self-Defense and Defense of Another**

The defendant contends that the trial court erred by not instructing the jury concerning the defenses of self-defense and defense of another.[1] He argues that he had a reasonable belief that Ms. Carranza was in imminent danger of serious bodily injury. The State argues that the defense was not fairly raised by the poof and, therefore, the trial court correctly denied the defendant's request. Upon review, we agree with the State and affirm the decision of the trial court.

{ "pageset": "S29"The defense of self-defense is expressly provided for in Tennessee by statute and is defined, in relevant part, as follows:

(a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger

---

[1] In his brief, the defendant also claims that the trial court should have instructed the jury on self-defense. However, the defendant fails to present an argument in support of his claim.

creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (2003). Tennessee Code likewise provides for the defense of defense of another:

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. § 39-11-612 (2003).

A trial court has the duty to "give a complete charge of the law applicable to the facts of the case." *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn. 1986). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial . . . ." *State v. Anderson,* 958 S.W.2d 9, 17 (Tenn. Crim. App. 1998). *See also Myers v. State,* 185 Tenn. 264, 206 S.W.2d 30, 32 (Tenn. 1947) (holding that a defendant is entitled to an affirmative instruction on self-defense if raised by the evidence). In deciding whether a defense instruction is warranted, the trial court "must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims,* 45 S.W.3d 1, 9 (Tenn. 2001).

The defendant correctly asserts that, when evidence adequately supporting self-defense is admitted at trial, the question of whether an individual acted in self-defense is a factual question for the jury. *See State v. Ivy,* 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). However, before a trial court may submit a defense question to a jury, the proof

must fairly raise an issue as to the existence of that defense. Tenn. Code Ann. § 39-11-203(c) (2006). The defendant has the burden of introducing this proof. Tenn. Code Ann. § 39-11-203(c), Sentencing Commission Comments. Thus, this Court may find error only if a jury charge "fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Phipps,* 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

In this case, the trial court declined to instruct the jury on self-defense and defense of another because the evidence did not suggest the defendant had a reasonable or real fear that he victim would hurt anyone. The trial court concluded that the record was void of any proof to support a conclusion that the defendant had a real or honest belief that Ms. Carranza was in imminent danger of death or serious bodily injury. Therefore, the trial court found that the defendant failed to present evidence that fairly raised an issue as to whether the defendant acted in defense of either self or others when he attacked the unarmed victim and stabbed him repeatedly.

We conclude, as did the trial court, that, without evidence either that the victim acted in a manner causing the defendant to believe that the victim presented an

"imminent danger of death or serious bodily injury," the record contains no evidence that the defendant's force was "immediately necessary to protect against" the victim. Tenn. Code Ann. § 39-11-611(a). Thus, there is no basis for this Court to conclude that the evidence fairly raised an issue as to whether the defendant acted in defense of either self or another. Accordingly, we conclude the trial court's refusal to instruct the jury on self-defense and defense of person(s) was not error.

## II.     Chain of Custody

The defendant contends that the State failed to adequately establish the chain of custody concerning the bloody clothing that was collected and processed in the instant matter and, therefore, the trial court erred in allowing the admission of the clothing and the subsequent DNA analysis. The State argues that that the record sufficiently linked the clothing to the defendant, the defendant has failed to show the trial court abused its discretion in allowing the admission of the clothing and the DNA results. Upon review of the record, we agree with the State.

12

Rule 901(a) of the Tennessee Rules of Evidence requires the authentication of tangible evidence: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." If the proffered evidence is unique, readily identifiable, and relatively resistant to change, the foundation need only consist of testimony confirming its relevance. It is when the evidence is susceptible to alteration that the trial court requires a more stringent foundation, entailing a chain of custody of the item with sufficient completeness to render it improbable that the original item has either been exchanged with another or has been subjected to tampering or contamination. *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989).

In setting up the chain of evidence, the prosecution is not required to elicit testimony from every custodian or every person who had an opportunity to come into contact with the evidence at issue. *United States v. Harrington*, 923 F.2d 1371 (9th Cir. 1991). Instead, the burden is on the prosecution to demonstrate that it is reasonably probable or reasonably certain that no tampering, alteration, or substitution has occurred.

*United States v. Ortiz*, 966 F.2d 707 (1st Cir. 1992). Once the threshold of the admissibility has been met, any challenges to the chain of custody become considerations for the fact-finder. *United States v. Lopez*, 758 F.2d 1517 (11th Cir. 1985).

In *State v. Scott*, 33 S.W.3d 746 (Tenn. 2000), our Supreme Court confirmed that Rule 901 did not require the identity of tangible evidence admitted through a chain of custody to be proved beyond all possibility of doubt or otherwise exclude every possibility of tampering. *Id.* at 760. So, when the State fails to call each and every witness within the chain of custody or the process is otherwise defective, tangible evidence may nevertheless be admissible if, in the discretion of the trial judge, the evidence has been adequately identified and "there was no substantial alteration . . . which would affect its validity." *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Before the admission or exclusion of the evidence offered, trial courts should consider its nature and all of the surrounding circumstances, "including presentation, custody and probability of tampering or alteration." *United States v. Cardenas*, 864 F.2d at 1531; *see Reed v. United States*, 377 F.2d 891, 893 (10th Cir. 1967). If these facts and circumstances reasonably establish the identity and integrity of

the evidence within the discretion of the trial court, the evidence may be admitted. *Id*.; Neil P. Cohen et al., *Tennessee Law of Evidence*, § 901.12 (3d ed.1995).

While the State did not introduce testimony from every link in the chain of custody, the proof presented was sufficient to establish the identity and integrity of the evidence. Specifically, Deputy Webster testified that he assisted in the apprehension of the defendant and identified, at trial, the clothing worn by the defendant at the time of his arrest. Deputy Webster also took photographs of the defendant upon his arrest and identified those pictures at trial as well. Additionally, Deputy McDougal testified that he transported the defendant from the scene of his arrest to the Maury County Jail. Deputy McDougal also described the defendant's bloody clothing. According to Deputy McDougal, the defendant's bloody clothing was collected by the booking officer and then given to him in a brown paper Piggly Wiggly bag for transport to Lawrence County. The bag was folded at the top and secured with "biohazard tape." Inv. Mayes corroborated Deputy McDougal's testimony stating that he received sealed brown paper Piggly Wiggly bag from Deputy McDougal. Inv. Mayes then placed the evidence in the temporary evidence locker, and it was later transported by the evidence custodian to the

15

evidence room. Inv. Amy Moore testified that she collected the evidence from the evidence room and sent it to the TBI Crime Laboratory in Nashville for testing and analysis.

As indicated, the purpose of the chain of custody requirement is to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence. *Scott*, 33 S.W.3d at 760; *see State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). It is only when the trial court has applied an incorrect legal standard or reached a decision which is against logic or reasoning that the appellate courts may intervene under the abuse of discretion standard and exclude the evidence. *Scott*, 33 S.W.3d at 752; *State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998). When the trial court ruled that the evidence had met the threshold requirement of reasonable assurance, the defendant was entitled to, and did, present a vigorous cross-examination, testing the { "pageset": "S2c propriety of the chain and the credibility and competence of the witnesses who supported the admission of the evidence. Thus, the weight to be given the proof properly became a question for the jury.

16

Based on the foregoing, it is clear that the trial court did not abuse its discretion in determining that the proof sufficiently established the identity of the clothing and that there was no substantial alteration to the evidence, thus preserving its integrity. Accordingly, we find that the defendant is not entitled to relief on this claim.

## *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE

17